**John B. CLYBURN, Appellant,**

v.

**NEWS WORLD COMMUNICATIONS, INC., and One–Up Enterprises, Inc., Appellees.**

No. 89–7057.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 30, 1990.

Decided May 18, 1990.

J. Philip Kessel, with whom Milton Heller, Washington, D.C., was on the brief, for appellant.

Allen V. Farber, with whom Keith R. Anderson and James A. Barker, Jr., Washington, D.C., were on the brief, for appellees.

Before WALD, Chief Judge, RUTH BADER GINSBURG and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

In a series of articles and editorials in 1986 the Washington Times described Joann Medina's collapse from a drug overdose and her death four days later. The paper depicted Medina's boyfriend, plaintiff John Clyburn, as waiting "several critical hours" after Medina's collapse to call for help, in order to allow other partygoers to leave the scene. Clyburn sued the Times's publisher, News World Communications, Inc., and News World's· owner, One–Up Enterprises, Inc., for libel. We agree with the district court that Clyburn was a public figure for purposes of this case, and that he failed to introduce enough evidence of actual malice to survive defendants' summary judgment motion.

## I

Joann Medina collapsed at an apartment on North Capitol Street in Washington, D.C. sometime in the early morning hours of December 10, 1983. Clyburn was one of those with her at the time. Someone called 911, and paramedics came and attempted

unsuccessfully to revive her; she lapsed into a coma and died four days later. The barbiturates, cocaine, and alcohol found in her body led the coroner initially to call her death a suicide; he later changed it to "undetermined."

In 1984 agents from the Drug Enforcement Administration interviewed Clyburn on the subject. In particular, they asked whether Medina had obtained the drugs from Karen Johnson, a friend of Mayor Barry's who had been convicted of possession and conspiracy to distribute cocaine, see Joint Appendix ("J.A.") 66 (affidavit of Hedges), and whether any highranking city officials had been at the apartment with Medina and Clyburn that night.[1] Clyburn also spoke to a reporter from the Washington Post about the circumstances surrounding Ms. Medina's collapse. At both interviews, Clyburn said that he had called 911 and that he was alone with Ms. Medina at the time. He admitted later that he was not alone and that a woman called the paramedics.

Washington newspapers covered the event in some detail in 1984. The Washington Post ran a story in August discussing the medical examiner's claim that political pressure had been exerted to make him change Medina's death certificate. The article also noted that "[t]he U.S. Attorney's office is trying to determine how Medina died and how she obtained the cocaine found in her blood." *Death Probed After Autopsy Was Changed*, Washington Post, Aug. 11, 1984, at B3, col. 2. The Washington Times published six articles describing the ongoing investigation by the D.C. Police Department, the DEA, and the U.S. Attorney's office, especially their inquiry into whether any highranking Barry administration officials had been at the party. See, e.g., *D.C. Aides Probed in Drug Death of Woman at Party*, Washington Times, Aug. 15, 1984, at 1A; *Feds Check Guest List in D.C. Drug Probe*, Washington Times, Aug. 16, 1984, at 5A. Four of the six articles mentioned Clyburn, includ-

ing his consulting firm's contracts with the D.C. government and his presence at the scene of Medina's collapse.

In 1986 the Times published the articles that are the subject of this lawsuit. Aside from rehashing what had appeared previously, they stated that those at the party, including Clyburn, waited "several critical hours" after Medina's collapse before calling an ambulance so that those present could clear out before the police arrived. This assertion formed the basis of Clyburn's libel suit.

The district court granted the Times's motion for summary judgment, *Clyburn v. News World Communications, Inc.*, 705 F.Supp. 635 (D.D.C.1989), and this appeal followed.

II

A. *Limited-purpose Public Figure*

Under *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351, 94 S.Ct. 2997, 3013, 41 L.Ed.2d 789 (1974), a person may "inject[ ] himself or [be] drawn into a particular public controversy" sufficiently to become "a public figure for a limited range of issues." On those issues, such a person can prevail in a defamation suit only by proving the defendant's "actual malice" under *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). In *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1296–98 (D.C. Cir.1980), we formulated a three-part test for identifying a limited-purpose public figure, requiring (1) that there have been a public controversy; (2) that the plaintiff have played a sufficiently central role in the controversy; and (3) that the alleged defamatory statement have been germane to the plaintiff's participation in the controversy. See *Tavoulareas v. Piro*, 817 F.2d 762, 771–75 (D.C.Cir.1987) (en banc) (applying *Waldbaum* test). In fact the third component plainly goes not to identifying the plaintiff as a public figure, but to

---

1. The record does not reveal why the DEA investigation sought links to Ms. Johnson or highranking officials of the Barry administration. Possible reasons were Clyburn's presence at the scene of her collapse, his longtime association with Mayor Barry, and the presence of members of the Barry administration at Medina's funeral.

whether the defamatory statement is adequately linked to the issues for which he is a public figure.

People's interest in a story purely as voyeurs is not enough to make it a public controversy for these purposes. See *Time, Inc. v. Firestone*, 424 U.S. 448, 454, 96 S.Ct. 958, 965, 47 L.Ed.2d 154 (1976). There must be "foreseeable and substantial ramifications for nonparticipants." *Waldbaum*, 627 F.2d at 1296–97. Here, the DEA, the U.S. Attorney's office, and the D.C. Police Department investigated Medina's death to see whether there was any connection between her drug abuse and the Barry administration—particularly whether a Barry associate was a source of her drugs or a member of his administration attended the party at which she collapsed. 705 F.Supp. at 640. These issues were a subject of DEA and Washington Post interviews. The 1984 newspaper coverage—which Clyburn does not claim libelled him—made the inquiries public. See, e.g., *Death Probed After Autopsy Was Changed*, Washington Post, Aug. 11, 1984, at B3, col. 2 (stating that the U.S. Attorney's office was investigating Medina's case "to determine how Medina died and how she obtained the cocaine found in her blood"). Possible drug dealing and drug use by public officials and their friends obviously have ramifications for others, see *Harte–Hanks Communications, Inc. v. Connaughton*, 109 S.Ct. 2678, 2695–96, 105 L.Ed.2d 562 (1989), and thus the controversy satisfies *Waldbaum*.

In discussing whether a plaintiff's role in a controversy was central enough to justify imposing the actual malice burden, the Supreme Court has explained that a private individual typically lacks the public figure's ability to use the media for rebuttal, and "[m]ore important," has not run "the risk of closer public scrutiny" that falls on those who, for example, seek public office. *Gertz*, 418 U.S. at 344, 94 S.Ct. at 3009. Clearly concerned lest the *New York Times* standard be thrust on individuals who

chose not to run such risks, the Court declared that though it "may be possible for someone to become a public figure through no purposeful action of his own, . . . the instances of truly involuntary public figures must be exceedingly rare." *Id.* 418 U.S. at 345, 94 S.Ct. at 3009. Typically, the Court suggested, limited-purpose public figures will be persons who "have thrust themselves to the front of particular public controversies in order to influence the resolution of the issues involved." *Id.*[2] Clyburn denies that he injected himself into the public controversy at all.

■ Courts have placed weight on a plaintiff's "trying to influence the outcome" of a controversy. *Waldbaum*, 627 F.2d at 1297; compare *Wolston v. Reader's Digest Ass'n*, 443 U.S. 157, 168, 99 S.Ct. 2701, 2707, 61 L.Ed.2d 450 (1979) (plaintiff who "did not in any way seek to arouse public sentiment in his favor" found not to be limited-purpose public figure). Of course, this can not include statements that merely answer the alleged libel itself; if it did, libellers could "create their own defense by making the claimant a public figure." *Hutchinson v. Proxmire*, 443 U.S. 111, 135, 99 S.Ct. 2675, 2688, 61 L.Ed.2d 411 (1979). Similarly, we have doubts about placing much weight on purely defensive, truthful statements made when an individual finds himself at the center of a public controversy but before any libel occurs; it is not clear why someone dragged into a controversy should be able to speak publicly only at the expense of foregoing a private person's protection from defamation. Indeed, the cases have suggested that ordinarily something more than a plaintiff's short simple statement of his view of the story is required; he renders himself a public figure only if he voluntarily "draw[s] attention to himself" or uses his position in the controversy "as a fulcrum to create public discussion." *Wolston*, 443 U.S. at 168, 99 S.Ct. at 2708. See also *Time, Inc. v. Firestone*, 424 U.S. 448, 454

---

**2.** Almost anyone who finds himself in the middle of a controversy will likely have enough access to the press to rebut any allegedly libelous statements, thus satisfying the Supreme

Court's first concern. It is perhaps because of this that the Court has regarded the second justification as more important.

n. 3, 96 S.Ct. 958, 965 n. 3, 47 L.Ed.2d 154 (1976) (plaintiff not limited public figure because she confined her press conferences to issues of no legitimate public concern); *Tavoulareas*, 817 F.2d at 773–74 (plaintiff who seized spotlight on public issues found public figure). Here, Clyburn *falsely* told the Washington Post that he had been alone with Medina and had called 911. We view this cover-up attempt as going beyond an ordinary citizen's response to the eruption of a public fray around him.

■ More important, Clyburn's acts *before* any controversy arose put him at its center. His consulting firm had numerous contracts with the District government, he had many social contacts with administration officials, and Medina, at least as one may judge from attendance at her funeral, also enjoyed such ties. Clyburn also spent the night of Medina's collapse in her company. One may hobnob with high officials without becoming a public figure, but one who does so runs the risk that personal tragedies that for less well-connected people would pass unnoticed may place him at the heart of a public controversy. Clyburn engaged in conduct that he knew markedly raised the chances that he would become embroiled in a public controversy. This conduct, together with his false statements at the controversy's outset, disable him from claiming the protections of a purely "private" person. See, e.g., *Marcone v. Penthouse International Magazine for Men*, 754 F.2d 1072, 1086 (3rd Cir.1985) (plaintiff's "voluntary connection" with widely publicized motorcycle gangs contributed to his public figure status); *Rosanova v. Playboy Enterprises, Inc.*, 580 F.2d 859, 861 (5th Cir.1978) (plaintiff held to be limited-purpose public figure because he "voluntarily engaged in a course that was bound to invite attention and comment"); see also *McDowell v. Paiewonsky*, 769 F.2d 942, 949–51 (3rd Cir.1985); *Jensen v. Times Mirror Co.*, 634 F.Supp. 304, 310–13 (D.Conn.1986) (plaintiff held to be limited public figure because she roomed with (and moved in social circles that included) a well-known public figure who was "underground" but whose true identity was known to plaintiff).

Finally, the alleged defamatory statement—that Clyburn and his friends delayed calling for help so that other party-goers could first leave—relates directly to Clyburn's role in the controversy with respect to which he became a limited-purpose public figure.

## B. *Actual Malice*

■ As a limited-purpose public figure, Clyburn could successfully resist a summary judgment motion only if he could point to record evidence from which a reasonable jury could find (by the "clear and convincing" standard) that the Times published the articles in question with actual malice. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–56, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); see also *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 162, 87 S.Ct. 1975, 1995, 18 L.Ed.2d 1094 (1967) (opinion of Warren, C.J.) (extending *New York Times* test to public figures).

■ A newspaper publishes an article with "actual malice" if it knowingly or recklessly disregards the truth. See *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964). The standard is not satisfied even by proof of "highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." *Harte–Hanks*, 109 S.Ct. at 2685. The inquiry is said to be ultimately a subjective one—"the defendant [must have] in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). But, as is often true for inquiries into state of mind, proof may take the form of circumstantial evidence, such as the existence of "obvious reasons to doubt the veracity of the informant or the accuracy of his reports" or the inherent improbability of the reports. *Id*. at 732, 88 S.Ct. at 1326; *Harte–Hanks*, 109 S.Ct. at 2686.

■ According to Clyburn, the "sting" of the libel "lies in the allegation that persons present at the scene of [Medina's] collapse deliberately delayed calling for an ambulance" for the period stated by the Times, "several critical hours." Brief for Appellant at 44. We discern two possible libelous implications: first, that Clyburn delayed calling for help to any non-trivial extent, thereby possibly increasing the likelihood of death; second, that Clyburn waited for so long.

1. *Delay.* The Times relied on three sources for the proposition that there had been a delay in seeking help. Clyburn attacks the reliability of one (Michael Wheeler) on the ground that his statements reflect an obvious and extreme bias. Although there are real problems with Clyburn's theory (e.g., the bias appears mainly directed at Barry, not Clyburn), we assume arguendo that Wheeler's contribution was worthless. The bias of one source, corroborating two independent ones, however, does not detract from the reliability of the latter. Cf. *Tavoulareas,* 817 F.2d at 792–93.

This takes us to the remaining two, both confidential law enforcement sources—one a D.C. police officer, the other an FBI agent. They had gathered their information from summaries of interviews with eyewitnesses and with others who had talked to eyewitnesses. Clyburn does not claim that at the time the Times published the disputed articles it had any reason to believe that bias or past inaccuracy undermined the reliability of the confidential law enforcement sources or the people interviewed. Without more, the Times was under no duty to dig deeper. See *New York Times,* 376 U.S. at 287–88, 84 S.Ct. at 729–30; *St. Amant v. Thompson,* 390 U.S. 727, 733, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262 (1968) (failure to investigate in itself raises no inference of actual malice). Compare *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 157–58, 87 S.Ct. 1975, 1992–93, 18 L.Ed.2d 1094 (1967) (opinion of Harlan, J.) (when newspaper knows that sole source for story has been convicted of "bad check charges," failure to follow up on obvious leads is enough to impose liability).

Clyburn's sole attack, then, is on the sources' inconsistencies and likely memory loss—two years passed between the original inquiry and the time in 1986 when the sources provided the information. To the extent Clyburn invites us to impose on reporters a blanket duty to discount a source solely because its knowledge is two years old, we reject the invitation. And while the sources' memory of the interview summaries doubtless frayed between 1984 and 1986 (as evidenced by the differences in their lists of guests at the December 9–10, 1983 party), Clyburn offered no evidence that any of the sources wavered in their assertions that a delay had occurred. Discrepancy as to minor details, without more, does not cast doubt on the main thrust of a source's information. See *Herbert v. Lando,* 781 F.2d 298, 306 (2d Cir.1986).

Nor does the hearsay character of the source's information indicate actual malice by the Times. Clyburn points to *King v. Globe Newspaper Co.,* 400 Mass. 705, 512 N.E.2d 241, 250–51 (1987), in which the Massachusetts Supreme Judicial Court, concluding that a reasonable jury could infer actual malice, characterized the source's statement as "hearsay, perhaps multi-level." Reporters cannot be expected to insist on statements that would be admissible under the Federal Rules of Evidence, and the court in *King* intended no such requirement. There the source did not know where he had heard the information he gave the reporter, and the information related to a supposed phone call between two individuals that both would have every wish—and almost certainly the ability—to conceal. The levels of hearsay there were so numerous as to draw reliability seriously in question, but that is not true here, where the law enforcement officers relied on officially collected summaries of eyewitness statements.

■ 2. *Length of delay.* The Times articles asserted not only the presence of delay in getting help for Ms. Medina but also that it lasted "several critical hours." We assume without deciding that a duration of "hours," as opposed simply to any

non-trivial length of time, constitutes an independent libel. In fact, any material delay in seeking help for the victim of a drug overdose, where based on the actor's face-saving concerns, seems bad enough. Focus on the marginal issue of the exact length is a little reminiscent of Lady Macbeth's response to word of Duncan's death, "What, in our house?"

The Times states that only one source (Source 2, a D.C. police officer) actually gave an estimate of the length of delay as "several hours." See J.A. 62–63 (affidavit of Hedges). The other two sources who stated that there had been a delay, Source B and Wheeler, gave no estimates of its duration. Although Hedges, the Times reporter who had interviewed Source 2, made notes of the conversation, Clyburn did not make a timely effort to insert the notes into the record; his belated motion to do so was rebuffed by the district court in a ruling not disputed here. See Memorandum Order, Dec. 6, 1989, No. 86–1149. Clyburn makes much, however, of an exchange in Hedges's deposition that may suggest a possible conflict between the notes and his testimony. After reviewing his notes, Hedges was asked, "What words did [Source 2] use that led you to believe he meant several hours?" He replied, "I can't reconstruct from my—I can't reconstruct precisely the phrases he used."

█ If there be a conflict between Hedges's notes and his testimony, we may not take it into account *except* as actually reflected in his statements on deposition. See *Frito–Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1035–36 (D.C.Cir.1988). On this record Hedges's testimony that the Times's use of "several critical hours" *accurately* reflected what Source 2 told him is unrebutted. Compare *Westmoreland v. CBS Inc.*, 596 F.Supp. 1170, 1172–77 (S.D.N.Y. 1984) (denying summary judgment on ground that news report arguably exaggerated actual evidence of facts which were available for comparison before the district judge).

The deposition itself, however, conveys an indication at least of some vulnerability. From this, Clyburn argues, a reasonable jury could infer that the Times referred to the length of delay "without any factual basis." Assuming a jury could discredit Hedges's testimony, however, such a factual vacuum would not be the same as "clear and convincing evidence of actual malice." Cf. *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 512, 104 S.Ct. 1949, 1966, 80 L.Ed.2d 502 (1984) (discrediting of author witness not ipso facto proof of actual malice).

█ We recognize that where the primary source of evidence is the reporter's own (naturally self-interested) testimony of what a confidential source told him, the combination of the burden of proof and the reporter's privilege to withhold the source's identity confront a defamation plaintiff with unusual difficulties. But the reporter's privilege is a qualified one. If the plaintiff exhausts all reasonable alternative means of identifying the source, the privilege may yield. See *Zerilli v. Smith*, 656 F.2d 705, 713–14 (D.C.Cir.1981); *Carey v. Hume*, 492 F.2d 631, 639 (D.C.Cir.1974). Here the district court found that Clyburn "utterly failed" to pursue "obvious alternative sources of information," see J.A. 47–52 (Memorandum Order denying Clyburn's motion to compel disclosure of the confidential sources), and accordingly upheld the privilege. Clyburn asserts no error in that ruling. Thus the failure to offer evidence of actual malice must be charged squarely to him.

\* \* \* \* \* \*

After an independent review of the record, see *Harte–Hanks*, 109 S.Ct. at 2696, we are satisfied that the district court correctly granted the defendants' motion for summary judgment on actual malice. We therefore need not address Clyburn's motion for summary judgment on the issue of falsity. The judgment of the district court is

*Affirmed.*