Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued September 19, 2003      Decided December 12, 2003

No. 02-5294

CAREY DUNAI LOHRENZ,
APPELLANT

v.

ELAINE DONNELLY, CENTER FOR MILITARY READINESS, ET AL.,
APPELLEES

————

Appeal from the United States District Court
for the District of Columbia
(No. 96cv00777)

————

*Rodney A. Smolla* argued the cause and filed the briefs for appellant.

*Kent Masterson Brown* argued the cause for appellees. With him on the brief was *Frank M. Northam*.

Before: ROGERS and ROBERTS, *Circuit Judges,* and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

————

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

ROGERS, *Circuit Judge*: The principal issue in this appeal is the scope of the voluntary limited-purpose public figure doctrine. Carey Dunai Lohrenz became one of the first two women combat pilots in the United States Navy at a time when there was a public controversy about the appropriateness of women serving in combat roles. In appealing the grant of summary judgment on her defamation complaint against Elaine Donnelly and the Center for Military Readiness ("CMR"), Lohrenz contends that, because she was simply doing her job and was at most a peripheral figure in the controversy about whether the Navy was applying a double standard for women combat pilots, the district court erred in ruling she was a public figure. To the extent that the court might hold that she was an involuntary limited-purpose public figure, Lohrenz attacks this court's application of that doctrine in *Dameron v. Washington Magazine*, 779 F.2d 736 (D.C. Cir. 1985), *cert. denied*, 476 U.S. 1141 (1986), and urges that its application be limited or the case overruled. Finally, Lohrenz contends that the district court erred in finding that she failed to present evidence from which a reasonable jury could find by clear and convincing evidence that Donnelly and CMR published the alleged defamations with actual malice.

Because Lohrenz's evidence shows that she chose the F–14 combat jet while well aware of the public controversy over women in combat roles, her challenge to the ruling that she was a voluntary limited-purpose public figure once the Navy assigned her to the F–14 combat aircraft rings hollow: she chose combat training in the F–14 and when, as a result of that choice, she became one of the first two women combat pilots, a central role in the public controversy came with the territory. Having assumed the risk when she chose combat jets that she would in fact receive a combat assignment, Lt. Lohrenz attained a position of special prominence in the controversy when she "suited up" as an F–14 combat pilot. Therefore, because the alleged defamations were germane to her position as a woman combat pilot, we hold that the district court did not err, upon applying the three-part test of *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287 (D.C. Cir. 1980), *cert. denied*, 449 U.S. 898 (1980), in ruling

that Lohrenz was a limited-purpose public figure. Hence, we do not reach Lohrenz's challenge to the analysis in *Dameron*, which only the en banc court can properly entertain. *See LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (en banc). Further, because a review of the evidence, again viewed in the light most favorable to Lohrenz, shows that she failed to meet the stringent standard established by the Supreme Court for public figures, who must demonstrate by clear and convincing evidence that defamation defendants acted with actual malice, we affirm the judgment of the district court.

**I.**

Upon *de novo* review of the grant of summary judgment, *see Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994), the evidence, viewed in the light most favorable to Lohrenz as the non-moving party and drawing all reasonable inferences in her favor, *see Forman v. Small*, 271 F.3d 285, 291 (D.C. Cir. 2001), *cert. denied*, 536 U.S. 958 (2002); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); Fed. R. Civ. P. 56(c), shows the following:

Carey Dunai Lohrenz served as a member of the United States Navy following graduation from college in 1990, and continued to serve in the Navy until early 1999. She graduated from Aviation Officer Candidate School with academic honors and received her commission on May 17, 1991. She successfully completed Primary Flight Training on February 3, 1992 with first place honors (Commodore's List). As was tradition, in light of Lt. Lohrenz's graduation in the top ten percent of her class at Primary Flight School, the Navy recognized her superior performance as a student pilot by assigning her to be trained in a preferred class of aircraft. Lt. Lohrenz selected jets from among several alternatives. Following completion of Intermediate and Advanced Training, she received her designation as a naval aviator on June 25, 1993.

At the end of advanced jet training, pilots were given one opportunity to suggest which particular jet they would like to

pilot. Shortly before she had to make her choice, a personnel specialist in the Bureau of Naval Personnel advised Lt. Lohrenz that, because women jet pilots were only permitted to fly noncombat planes and all noncombat jets were being decommissioned, the Navy had no place for women jet pilots; she could either temporarily serve as a flight instructor or leave the Navy. However, in the intervening days, the Navy changed its policy, and permitted women to train for combat aircraft. As Lohrenz alleged in her complaint, she then "chose combat aviation." Amended Complaint ¶ 22. In June 1993, the Navy assigned Lt. Lohrenz to the West Coast F–14 program. Along with Lt. Kara Hultgreen, an experienced Navy pilot, Lt. Lohrenz began training in the F–14 Tomcat fighter jet in July 1993.

The Navy's decision to assign Lt. Lohrenz and Lt. Hultgreen as the first women to pilot United States armed forces combat aircraft occurred amidst an ongoing public controversy about the appropriateness of women serving in combat roles in the military. A subcontroversy concerned whether the military should relax physical strength and other standards to account for differences between male and female members of the armed services. And another subcontroversy related to whether women should serve as combat pilots in particular. These controversies persisted even after 1991, when Congress repealed the law barring women from combat fighters and bombers, and after April 1993, when, on the heels of the Tailhook scandal involving allegations that Navy officers had sexually harassed enlisted women, the Secretary of Defense lifted the Defense Department's ban on women serving in such positions.

Although she never initiated any contacts with the media prior to the alleged defamations, Lt. Lohrenz's new combat assignment made a few headlines. Her hometown newspapers in Green Bay and Milwaukee, Wisconsin published brief human interest stories about her and her family members, most of whom have been military pilots. Further, in response to Navy encouragement that Lt. Lohrenz did not feel at liberty to decline, she granted an interview to KNSD–TV, a local San Diego, California station. Also, *The Compass*, a

publication for the naval community in San Diego where Lt. Lohrenz was posted, covered her assignment to the F–14. Lt. Lohrenz explained in *The Compass* that the Navy's decision to allow her to choose combat aircraft came as a great relief; she had been "in tears" because she "couldn't believe that all the guys [she] had gone through flight school with, and had worked so hard and competed with and done well, were going to go out to the fleet and get a chance and [she] wasn't going to have [her] chance." Scott D. Williams, *First Women Join Fleet Fighter Squadron: The Jet Doesn't Know the Difference*, The Compass, Sept. 9, 1994, at A1. Her Commanding Officer, however, succeeded in deflecting most of the media attention directed at her. This changed after October 28, 1994.

After eleven months of training in the F–14, Lieutenants Hultgreen and Lohrenz satisfied requirements for posting with a carrier-based flight squadron. In August 1994, the Navy assigned both women to fighter Squadron 213 attached to the U.S.S. Abraham Lincoln in the Pacific Fleet. They participated in regular training exercises to maintain their combat readiness. In the course of such an exercise, on October 28, 1994, Lt. Hultgreen died while attempting to land an F–14 on the U.S.S. Lincoln; the Navy subsequently determined that the plane did not signal to the pilot that one of its engines was not working until it was too late to avoid a crash. After Lt. Hultgreen's death, the media turned its attention to the question of whether the Navy had established a "double standard" in order to enable women to qualify as combat pilots, initially focusing on Lt. Hultgreen. Three months after Lt. Hultgreen's crash, Elaine Donnelly, who had long opposed permitting women to serve in combat positions, drew attention to Lt. Lohrenz. Starting in the 1970s, Donnelly had testified before Congress in opposition to women in combat, published on the subject, and, in the early 1990s, served on the Presidential Commission on Assignment of Women in the Armed Services. In 1992, Donnelly incorporated the Center for Military Readiness and served as its president; the CMR has regularly published articles and issued press releases opposing women serving in combat

positions, including as combat pilots. As relevant here, Donnelly and CMR published four allegedly defamatory publications about Lt. Lohrenz.

First, on January 16, 1995 Donnelly wrote on CMR letterhead to Senator Strom Thurmond to alert the then-Chairman of the Senate Armed Services Committee to "certain practices designed to assure that women will not fail [that] have now been extended to the demanding and dangerous field of carrier aviation in the F–14 community." Donnelly characterized both Lt. Hultgreen and the other woman combat pilot, "Pilot B," as unqualified pilots. She quoted at length from a letter she had received from Lt. Patrick Jerome Burns, who had briefly been an F–14 instructor for both women; however, she did not then identify Lt. Burns by name. Donnelly and Lt. Burns cast the Navy's decision to break down a gender barrier and permit women pilots to fly combat aircraft as "politically driven." They wrote, "Navy policy on the integration of women into fleet F–14 squadrons is, thus far, an abject failure. It is indicative of the problems of gender integration, which must be corrected, across the spectrum."

Second, a few months later, on April 25, 1995, Donnelly republished the letter to Senator Thurmond as part of a more comprehensive CMR "special report" on alleged double standards in naval aviation. The Donnelly Report included excerpts from Lt. Lohrenz's confidential training records, parts of which had been sent to Donnelly by Lt. Burns. The Donnelly Report reiterated that Lt. Hultgreen and Pilot B were unqualified pilots, and noted special accommodations the Navy had made for Pilot B. The Report also referenced several of the Navy's specific rejections of Donnelly's conclusions. The Donnelly Report was circulated to the media, online, and within the naval aviator community, including on the U.S.S. Lincoln, where Lt. Lohrenz was still based. Even though Lt. Lohrenz was referred to in the Donnelly Report as "Pilot B," as the only remaining carrier-qualified woman F–14 pilot, her identity was known within the naval aviation community, particularly on the U.S.S. Lincoln. Shortly thereafter, the media revealed Lt. Lohrenz's name. *See, e.g.*, James W. Crawley, *Navy Grounds Female F–14 Pilot for*

*Evaluation of Flying Skills*, San Diego Union–Trib., June 30, 1995, at B–1.

Third, almost a year later, on March 28, 1996, Donnelly restated her conclusion that Lt. Lohrenz was an incompetent combat pilot in a speech at the Army–Navy Club in Washington, D.C. Fourth, twenty months later, on November 6, 1997, after Lt. Lohrenz had filed suit, Donnelly repeated this conclusion in a CMR press release, referring to Lt. Lohrenz by name. The press release further asserted that the Navy's integration of women into combat squadrons was part of a "reckless" "race" with the Air Force that had been "instigated by aggressive female officers, feminist advocates, and Navy public affairs officers."

On April 24, 1996, Lt. Lohrenz filed a defamation action against Donnelly and CMR as well as the Copley Press (d/b/a *The San Diego Union Tribune*), News World Communications, Inc. (d/b/a *The Washington Times*), and John Does 1–100 (retired officers of the Navy and other military services, who allegedly assisted Donnelly and republished her statements). Lohrenz alleged in her complaint that she had become the victim of a campaign by Donnelly and the other defendants, "the gist of which was that the Navy engaged in preferential treatment of female aviators, passing and promoting them despite their substandard performance." Appellant's Br. at 2. Lt. Lohrenz sued the three non-press defendants, Donnelly, CMR, and the John Does, for libel and slander. Her complaint also included causes of action for libel against the two media defendants, and an invasion of privacy claim against all defendants.

Lt. Lohrenz sought compensatory and punitive damages of not less than $50,000 in view of the injuries proximately caused, including her removal from flight status by the Navy on May 30, 1995. Whereas she had been evaluated as an above-average pilot until the publication of The Donnelly Report, her instructors gave her only average marks in April and May 1995. Lt. Lohrenz further alleged that despite the conclusion of a Field Naval Aviation Evaluation Board that she received no preferential treatment, was a qualified pilot,

and should have her flight status reinstated but be assigned to a different aircraft, she had been unable to obtain reinstatement as any type of naval aviator because of the damage done to her reputation as a fighter pilot by the false and defamatory statements of the defendants. Although two years later the Navy Inspector General overturned the Board's decision that Lt. Lohrenz be assigned to fly in a different aircraft and also found that the failure to return her to flight status lacked substantial justification, Lt. Lohrenz was never again assigned to fly a naval combat plane. As a result of being out of the field for two years, Lt. Lohrenz alleged, she lost her career as a naval aviator.

The district court entered summary judgment for Donnelly and CMR. *Lohrenz v. Donnelly*, 223 F. Supp. 2d 25 (D.D.C. 2002). The court ruled that Lt. Lohrenz had become a limited-purpose public figure, albeit possibly involuntarily, *id.* at 44, and had failed to meet her burden to show that Donnelly and CMR had published the defamatory material with actual malice, *id*. at 58. The court found that Lt. Lohrenz was a public figure because of her past conduct, including taking on a role as one of the first two women combat pilots, her numerous appearances in the media before and after Lt. Hultgreen's crash, and the fact that "she was a forerunner in the military's attempt to integrate women into combat positions." *Id*. Rejecting Lohrenz's argument that notwithstanding numerous interviews she had not "thrust" herself into the media spotlight, the district court pointed to *Dameron*, 779 F.2d 736, stating that it was "well-settled that private individuals may become limited-purpose public figures unwillingly without voluntarily thrusting themselves into the public eye." *Id.* The court, citing *Clyburn v. News World Comm., Inc.*, 903 F.2d 29, 33 (D.C. Cir. 1990), also noted she "voluntarily gave statements about her F–14 assignment" and "was well-aware that her position as one of the first women F–14 pilots would attract public attention." *Id*. The court, therefore, concluded that as "a central figure in the public controversy over the place of women in the military" and given the media coverage in which she was often "featured prominently," Lt. Lohrenz was a limited-purpose public fig-

ure. *Id.* The district court, having found that Lohrenz failed to meet her burden to prove actual malice, rejected the alternative defense that the published allegations were substantially true, *id.* at 59, and did not reach the fair reporting defense based on the Navy Inspector General's Report, *id.* at 60. The district court had previously dismissed the complaints against the Copley Press for lack of jurisdiction, *Lohrenz v. Donnelly*, 958 F. Supp. 17 (D.D.C. 1997), and against the John Does, who were never identified, *Lohrenz v. Donnelly*, No. 96–777 (D.D.C. Aug. 16, 2002) (order of dismissal). News World Communications, Inc. settled Lt. Lohrenz's complaint against it. *Lohrenz*, 223 F. Supp. 2d at 30.

## II.

On appeal, Lohrenz contends that the district court erred in ruling, under *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1296–1300 (D.C. Cir. 1980), *cert. denied*, 449 U.S. 898 (1980), that she was a limited-purpose public figure, albeit possibly involuntarily. Devoting precious little of the argument in her brief to an examination of the district court's application of the three-part test of *Waldbaum*, Lohrenz does not challenge the appropriateness of *Waldbaum*'s analysis of the voluntary limited-purpose public figure doctrine, acknowledging that it was "faithful to the balance struck in *Gertz.*" Appellant's Br. at 21. Rather, Lohrenz's brief focuses on the involuntary public figure analysis in *Dameron v. Washington Magazine*, 779 F.2d 736, 741–42 (D.C. Cir. 1985), *cert. denied*, 476 U.S. 1141 (1986), which, she contends, is "fundamentally unsound." Appellant's Br. at 5. She maintains that because she was "at most on the broad periphery of a broad debate that intensified when a different female aviator lost her life in a crash," she is not a public figure under *Dameron*. *Id.* at 5–6. Lohrenz also contends that, even if the court determines she is an involuntary public figure, the district court erred in ruling that she failed to present evidence from which a reasonable jury could find that Donnelly and CMR acted with actual malice in publishing defamatory statements about her, and hence summary judgment was inappropriate. Lohrenz

does not challenge the district court's resolution of her invasion of privacy claims.

As a threshold matter, Lohrenz's focus on the involuntary public figure doctrine in *Dameron* is misplaced, because the evidence, viewed in the light most favorable to her, shows that Lt. Lohrenz was a voluntary limited-purpose public figure. In *Waldbaum*, the court addressed the question of "when an individual not a public official has left the relatively safe harbor that the law of defamation provides for private persons and has become a public figure within the meaning of the Supreme Court's decision in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974)." *Waldbaum*, 627 F.2d at 1289. Eric Waldbaum was the president and chief executive officer of a diversified food cooperative that ranked second largest in the country. He played an active role in setting the policies and standards within the supermarket industry: "He battled the traditional practices in the industry and fought particularly hard for the introduction of unit pricing and open dating in supermarkets." *Id.* at 1290. He held several meetings to which the press and public were invited, and his policy of consolidation to eliminate unprofitable outlets generated considerable comment in the affected area and in trade journals as well as general interest publications, such as the *Washington Post*. *Id.* & n.3. Waldbaum sued for libel when a trade publication reported that he had been dismissed by the Board of Directors and that the cooperative " 'has been losing money the last year and retrenching.' " *Id.* The district court ruled that Waldbaum was a public figure for purposes of the limited range of issues concerning the company's unique position within the supermarket industry and his efforts to advance that position. *Id.* at 1291.

This court affirmed. In concluding that "a person has become a public figure for limited purposes if he has attempted to have, or realistically can be expected to have, a major impact on the resolution of a specific public dispute that has foreseeable and substantial ramifications for persons beyond its immediate participants," *id.*, the court established a three-part test: (1) The court must isolate the public controversy, that is, "a dispute that in fact has received public attention

because its ramifications will be felt by persons who are not direct participants." *Id.* at 1296. (2) The court must analyze the plaintiff's role in it. "Trivial or tangential participation is not enough. . . . [To be a limited-purpose public figure, a plaintiff] must have achieved a 'special prominence' in the debate." *Id.* at 1297 (citation omitted). The court can look to the plaintiff's past conduct, the extent of press coverage, and the public reaction to his conduct or statements. *Id.* The court noted that a plaintiff "would be a public figure if the defamation pertains to the subcontroversy in which he is involved but would remain a private person for the overall controversy and its other phases." *Id.* at 1297 n.27. (3) Finally, the court must determine whether the alleged defamation was germane to the plaintiff's participation in the controversy. *Id.* at 1298. In the end, the court concluded that notwithstanding Waldbaum's active role and involvement with the media, he was a limited purpose public figure only for the purposes of the subcontroversy about his supermarket innovations. *Id.* at 1300.

We are mindful that, although *Waldbaum* "provides us with useful analytic tools[,] nevertheless, the touchstone remains [the standard the Supreme Court set forth for classifying an individual as a public figure, namely] whether an individual has 'assumed [a] role[ ] of especial prominence in the affairs of society . . . [that] invite[s] attention and comment.' *Gertz*, 418 U.S. at 345." *Tavoulareas v. Piro*, 817 F.2d 762, 773 (D.C. Cir. 1987) (en banc). In *Gertz,* the Supreme Court balanced the constitutional commitment to free speech and press and the interests served by the defamation law in protecting the dignity and worth of every human being, 418 U.S. at 341, and set the dividing line between public and private figures based on those who assumed the risk of publicity and had access to channels of communication to defend themselves, and those who did not, *id.* at 344. The Court in *Gertz* rejected the plurality's broad view in *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29 (1971), that the actual malice standard applied if the relevant controversy "is a matter of public or general concern without regard to whether the persons involved are famous or anonymous." *Id.* at 44.

Concluding that the *Rosenbloom* approach paid inadequate attention to the State's interest in protecting private persons from defamatory injury, *Gertz*, 418 U.S. at 346, the Court observed that while some persons would be public figures by virtue of their positions of "persuasive power and influence," typically, public figures will be persons who "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Id.* at 345.

As applied here, *Waldbaum*'s analysis is faithful to *Gertz*. The first and third prongs of the *Waldbaum* test are essentially uncontested by Lohrenz, for she concedes there was a public controversy about women in combat and also about the circumstances surrounding Lt. Hultgreen's death, *see* Appellant's Br. at 32–33, and the alleged defamatory statements by Donnelly and CMR plainly were germane to the subcontroversy about women combat pilots and the Navy's alleged double standards. *See Lohrenz v. Donnelly*, 223 F. Supp. 2d at 44. Thus, the remaining question is whether Lt. Lohrenz, at the time she became an F–14 combat pilot, achieved "a 'special prominence' in the debate," thereby satisfying *Waldbaum*'s second prong. 627 F.2d at 1297. She both rejects that conclusion, maintaining that she was only trying to do her job and her involvement in the public controversy was tangential at best, *see* Appellant's Br. at 32, and contests whether the general controversy about women in combat was sufficiently linked to her performance as an F–14 combat pilot to render her a public figure. *Id.*

To satisfy the *Waldbaum* inquiry's " 'special prominence' " requirement, "[t]he plaintiff must either have been purposefully trying to influence the outcome or could realistically have been expected, because of his position in the controversy, to have an impact on its resolution." 627 F.2d at 1297. This phrasing incorporates both *Gertz*'s analysis that, through "purposeful action of his own," 418 U.S. at 345, a plaintiff attains a position in the limelight, *see, e.g.*, *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 154 (l967), as well as *Gertz*'s general observation that the media is entitled to act on the assumption that public officials and public figures have ex-

posed themselves to increased risk of injury from defamation. 418 U.S. at 345. Although, as we understand Lohrenz's position on appeal, it was the Navy, not she, that placed her at the center of the controversy about women as combat pilots, the evidence, construed in the light most favorable to her, does not support her position. Lohrenz not only alleged that she "chose to be trained in combat aviation," Amended Complaint ¶ 22, her actions and statements belie any basis on which to conclude that she did not voluntarily seek to be in the combat pilot position to which the Navy assigned her. Once she "chose . . . combat aviation" by indicating her preference for the F–14 while knowing of the preexisting public controversy over the appropriateness of women in combat positions, Lt. Lohrenz assumed the risk that if she succeeded in qualifying for a combat assignment and the Navy made such an assignment, she would find herself at the center of the controversy as a result of the special prominence that she and only one other woman combat pilot attained upon receiving their F–14 assignments. That Lt. Lohrenz might have preferred a combat assignment that did not place her in the center of the public controversy is legally irrelevant.

Under the circumstances, Lohrenz's contention that she was, in effect, an anonymous Navy pilot, rings hollow as there is no evidence to support such a conclusion. By choosing to remain in the Navy as a combat pilot, and indicating her preferences among combat aircraft, Lt. Lohrenz became a limited purpose public figure at the point she "suited up" as an F–14 pilot. "[A] reasonable person would have concluded that this individual would play or was seeking to play a major role in determining the outcome of the controversy [about the appropriateness of women serving in combat roles]." *Waldbaum*, 627 F.2d at 1298. By choosing a path of endeavor as a combat pilot she assumed the risk that she would attain such an assignment, which, in light of the public controversy, meant she would be in a position of special prominence in that controversy. So long as defamatory statements made about her were germane to her role in that controversy, the *Waldbaum* inquiry is satisfied, and she is a voluntary public figure

for the limited purpose of the debate about whether and how women should be integrated into combat aviation roles. And, as the district court found, after the crash of Lt. Hultgreen's F–14, Lt. Lohrenz also became a central figure in the subcontroversy about whether the Navy was applying double standards for its women combat pilots. At both points, when she was assigned to the F–14 and in the aftermath of Lt. Hultgreen's crash, Lt. Lohrenz was a public figure whose performance would be of interest to the public. *See Gertz*, 418 U.S. at 344–45; *Waldbaum*, 627 F.2d at 1297.

Lohrenz fails in her attempt to suggest that her position was no different than that of the criminal trial attorney in *Gertz* or the consultant in *Clyburn*, 903 F.2d 29, who hobnobbed with government officials. In neither of those cases was there a preexisting public controversy comparable to that of which Lt. Lohrenz was aware when she "chose to be trained in combat aviation." Moreover, to the extent Lohrenz contends that the district court erred in "allowing the undeniable 'public interest' in the *general question* of 'women in combat' to morph into the public controversy germane to Lohrenz's defamation claim, which should have been focused on a public controversy *regarding the fitness or competence of Carey Lohrenz herself*," Appellant's Br. at 32, she ignores that the substance of the controversy about the appropriateness of women in combat positions embraced concerns about Lt. Lohrenz's performance as a pathbreaking woman combat pilot of unknown ability. In sum, the evidence, viewed most favorably to Lohrenz, fails to show the media was not entitled to assume that she had voluntarily exposed herself to an increased risk of injury from defamatory falsehoods about her role as a combat pilot.

With this conclusion, the court has no occasion to hold that either her earlier conduct or the media coverage following her assignment to the F–14 showed that Lt. Lohrenz was well-known or attempting to influence a public controversy, *see Wolston*, 443 U.S. at 167–68; prior to "suiting up" as an F–14 pilot, she had not been a general-purpose public figure or a voluntary limited-purpose public figure. *See Gertz*, 418 U.S. at 351–52. Neither her Navy enlistment and non-combat

pilot training, which did not render her "fam[ous]" or "noto-ri[ous]", *see id.*, nor her mere acquiescence to press inquiries fairly characterized as of a hometown-girl human interest variety, *see Waldbaum*, 627 F.2d at 1298 n.31, nor her attempts to defend herself through the media against alleged-ly defamatory statements by Donnelly and CMR, *see id.* at n.34; *cf. Time, Inc. v. Firestone*, 424 U.S. 448, 454 n.3 (1976), rendered her a public figure. Instead, it was her voluntary act of "cho[osing] combat aircraft," thereby assuming the risk of a combat assignment, followed by her "suiting up" as one of the first two American women combat pilots, that gave her "'special prominence'" in the controversy about women in combat and established her voluntary limited-purpose public figure status.

The result here is in accord with a principle alluded to by Justice Harlan in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 154 (1967) (with three Justices concurring and the Chief Justice concurring in the result), namely, the First Amend-ment requires that where, as here, recovery by a defamation plaintiff could be viewed as vindicating a government policy, a plaintiff must make the higher showing required by the actual malice standard. Further, our approach adheres to the princi-ple that, unless a plaintiff accepted a role in which she reasonably could have been expected to play a role in resolv-ing a controversy, *see Waldbaum*, 627 F.2d at 1297, merely accepting an anonymous assignment in an arena where there is a public controversy is not alone sufficient to transform a private person into a public figure. *Cf. Hutchinson v. Prox-mire*, 443 U.S. 111, 134–35 (1979); *see also Gertz*, 418 U.S. at 352. Lt. Lohrenz was not just any fighter pilot; when she "suited up," she could reasonably have been expected to know that she was assuming a position of "'special prominence'" in the controversy about women in combat roles. Again, it was not Lt. Lohrenz's decision to pursue a Navy career as a combat jet pilot that made her a public figure, but rather that in so doing she assumed the risk of success whereby she would become one of the first few women combat pilots and thus necessarily attain "'special prominence'" in an ongoing public controversy about such opportunities. Finally, the result here is consistent with *Gertz*'s principle that only those

with access to the media to defend themselves should be designated public figures. *See* 418 U.S. at 345. Lt. Lohrenz possessed ready access to the channels of public discourse, as evidenced not only by the media attention she received when first assigned as a combat pilot along with Lt. Hultgreen, but by her appearance on April 19, 1998, on the CBS television program *60 Minutes*.

Our conclusion about Lt. Lohrenz's public figure status does not suggest that she was not a good naval aviator trying to do her job, and it does not penalize her for acting with "professionalism," *see* Appellant's Br. 32, 35. Lt. Lohrenz was confronted with the choice of piloting a supersonic combat fighter jet as a voluntary public figure, or giving up her dream of being a Navy pilot in order to remain a private figure. But given that potentially difficult choice, it was nonetheless she who "chose jets" when she knew there was a public controversy about women in combat, and she must live with the consequences of that choice and her resulting assignment as one of the first women combat pilots. We hold that as an F–14 combat pilot Lt. Lohrenz became a voluntary limited-purpose public figure. Therefore, we do not reach Lohrenz's attacks on *Dameron.*

## III.

As a public figure, Lohrenz bore the burden of proving that Donnelly and CMR acted with actual malice, and not merely ordinary negligence, in publishing allegedly defamatory statements about her. The district court found that Lohrenz failed to present evidence from which a reasonable jury could so find. Lohrenz contends that the district court did not give her the benefit of the aggregate of her evidence, as she was entitled, *see, e.g.*, *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1304 (D.C. Cir. 1996); *Tavoulareas v. Piro*, 817 F.2d 762, 794 n.43 (D.C. Cir. 1987) (en banc), and that she presented "highly probative" evidence of actual malice by showing that "Donnelly and CMR were on a mission to advance a preconceived story line, and may have targeted Lohrenz to 'get' her out of their more generalized zeal to drum women from combat positions." Appellant's Br. at 38–39.

In a civil action where the subjective state of mind determination turns on credibility and nuance, Lohrenz's position that the issue should never have been decided on summary judgment has facial appeal. *See, e.g.*, *Goldwater v. Ginzburg*, 414 F.2d 324, 336–37 (2d Cir. 1969). The difficulty in agreeing with her contention that the district court erred in granting summary judgment stems not from the general proposition she asserts but from the nature of the heavy burden she bears. To determine whether Lohrenz met her burden to show actual malice by Donnelly and CMR in publishing the alleged defamations, the court must be able to find that there is clear and convincing evidence "to permit the conclusion that the[y] in fact entertained a serious doubt as to the truth of [their] publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). In that regard, the Supreme Court acknowledged in *St. Amant* that:

> It may be said that such a test puts a premium on ignorance, encourages the irresponsible publisher not to inquire, and permits the issue to be determined by the defendant's testimony that he published the statement in good faith and unaware of its probable falsity.... *New York Times* [*v. Sullivan*, 376 U.S. 254 (1964)] and succeeding cases have emphasized that the stake of the people in public business and the conduct of public officials is so great that neither the defense of truth nor the standard of ordinary care would protect against self-censorship and thus adequately implement First Amendment policies. Neither lies nor false communications serve the ends of the First Amendment, and no one suggests their desirability or further proliferation. But to insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones.

*Id.* at 731–32.

In the two decades since *St. Amant*, this court has elaborated on the evidentiary thresholds that a plaintiff must meet

to prove actual malice in a defamation claim. The court explained in *Tavoulareas,* 817 F.2d at 788–98, that the plaintiff must show, by clear and convincing evidence, that when the defendants published the alleged defamations they were subjectively aware that it was highly probable that the story was "(1) fabricated; (2) so inherently improbable that only a reckless person would have put [it] in circulation; or (3) based wholly on an unverified anonymous telephone call or some other source that appellees had obvious reasons to doubt." *Id.* at 790 (internal quotations omitted). Viewing the evidence in the light most favorable to Lohrenz as the non-moving party, *see* Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), we hold that she failed to meet her burden.

Evidence that the publishers of the alleged defamatory statements were on a mission to reinstate the ban against women being assigned to combat positions in the military does not suffice to show actual malice. That Donnelly and CMR acted on the basis of a biased source and incomplete information does not "demonstrate with clear and convincing evidence that the defendant[s] realized that [their] statement was false or that [they] subjectively entertained serious doubts as to the truth of [their] statement." *Bose Corp. v. Consumers' Union of U.S.*, 466 U.S. 485, 511 n.30 (1984).

Lohrenz's position — that Donnelly and CMR had to resolve doubts about the specific facts of Lt. Lohrenz's performance record once credible evidence was placed before them to cause them "obvious reasons" to doubt the reliability of the information they had previously trusted — assumes the proposition to be decided, namely whether the Navy's assertions and evidence that Lt. Lohrenz was a qualified F–14 combat pilot were credible. If the mere proffering of purportedly credible evidence that contradicts a publisher's story were enough to meet the *Tavoulareas* test, the resolution of the motion for summary judgment filed by Donnelly and CMR could have taken a different turn. As the law stands, Lohrenz's evidence must show more than "highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to

by responsible publishers." *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 666 (1989) (internal quotation omitted). Lohrenz's evidence also must show Donnelly's and CMR's "reckless disregard for the truth, . . . [such as] a high degree of awareness of . . . probable falsity, or . . . serious doubts as to the truth of [their] publication." *Connaughton*, 491 U.S. at 667 (internal citations omitted).

Donnelly stated in her letter to Senator Thurmond that Lt. Lohrenz ("Pilot B") was a substandard pilot who should not be flying and who had been assigned to the F–14 program on account of a "politically driven policy." Prior to writing the letter, Donnelly had obtained information about the sole surviving woman F–14 pilot from Lt. Burns, who briefly was one of Lt. Lohrenz's training officers. Whatever bias Lt. Burns may be shown to have against women in combat flight positions, Lohrenz's evidence shows that Donnelly's publication was based on a knowledgeable, non-anonymous source. Under the circumstances, *Tavoulareas* does not require more of a publisher. 817 F.2d at 790. Additionally, by the time she published The Donnelly Report, Donnelly also had portions of Lt. Lohrenz's training records that supported Lt. Burns' assertions that the Navy made special accommodations for Lt. Lohrenz.

Although failure to investigate does not in itself establish bad faith, *see St. Amant*, 390 U.S. at 733 (citing *New York Times*, 376 U.S at 287–88), it is true, as Lohrenz contends, that once the publisher has obvious reasons to doubt the accuracy of a story, the publisher must act reasonably in dispelling those doubts. *See id.* at 731 (citing *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 153 (1967)). "Thus, where the publisher undertakes to investigate the accuracy of a story and learns facts casting doubt on the information contained therein, it may not ignore those doubts, even though it had no duty to conduct the investigation in the first place." *Masson v. New Yorker Magazine, Inc.*, 960 F.2d 896, 901 (9th Cir. 1992) (on remand from the Supreme Court).

Donnelly and CMR never discovered any facts sufficient to cause them to doubt their conclusion about Lt. Lohrenz's

incompetence as an F–14 combat pilot. The evidence offered by Lohrenz is not comparable to the football game films available to the publisher in *Curtis Publishing* that demonstrated the falsity of the report it was relying on concerning the former football coach. 388 U.S. at 158. Even where doubt-inducing evidence could be discovered, a publisher may still opt not to seek out such evidence and may rely on an informed source, so long as there is no "obvious reason to doubt" that source. *See, e.g.*, *McFarlane*, 74 F.2d at 1305.

In fact, the information that Donnelly and CMR received reasonably led them not to investigate allegedly contradictory evidence. By the time Donnelly published The Donnelly Report, she had additional information from the Navy that appeared to confirm much of what Lt. Burns had told her about Lt. Lohrenz. Rear Admiral Lyle Bien's report, produced in reaction to Donnelly's letter to Senator Thurmond, confirmed Lt. Burns' allegations that Lt. Lohrenz had received a number of accommodations during training and stated that some of the officers, especially junior officers, thought the accommodations were excessive. Admiral Bien's report did not confirm that Lt. Lohrenz or the other woman pilot were unqualified. He viewed concessions as a matter within the discretion of the commanding officer so long as safety and common standards were maintained, but he did confirm that there were perceptions that a double standard was being applied. Admiral Bien nonetheless concluded that gender based bias had not tainted the Navy's training or rating of women combat pilots.

Donnelly had also been told by the Vice Chief of Naval Operations, Admiral Stanley Arthur, and other Navy officers that her conclusion about Lt. Lohrenz was wrong, that her information was coming from someone "working their own agenda," and that she should be aware that she had not seen the entire training record. The following year, prior to her Army–Navy Club speech, Donnelly had again been warned by Navy officials that her conclusion about Lt. Lohrenz was inaccurate. Yet publishers need not accept " 'denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves,

they hardly alert the conscientious reporter to the likelihood of error.'" *Connaughton*, 491 U.S. at 691 n.37 (citing *Edwards v. Nat'l Audubon Soc'y, Inc.*, 556 F.2d 113, 121 (2d Cir. 1977)). *See also Coliniatis v. Dimas*, 965 F. Supp. 511, 519 (S.D.N.Y. 1997). Unlike evidence that could be readily verified, *see, e.g.*, *Curtis Publishing*, 388 U.S. at 158; *McFarlane*, 74 F.3d at 1299, the Navy's denials did not give Donnelly "obvious reasons" to doubt the veracity of her publication. Donnelly, for example, could reasonably infer that Admiral Bien had not been objective in concluding, despite contrary evidence in his report that detailed special accommodations made for Lt. Lohrenz, that the pilot was safe to fly and that she had not been promoted based on a double standard. Furthermore, Admiral Bien wrote that no instructor interviewed had stated that Lt. Lohrenz and Lt. Hultgreen were unsafe to fly, yet Donnelly knew that Lt. Burns had been interviewed and claimed that he had said precisely that to Admiral Bien.

Hence, despite the Navy's denials, no reasonable juror could find either that Donnelly knew her charges were false, or that she had cause to "obviously doubt" her story. *See Sparshott v. Feld Entertainment, Inc.*, 311 F.3d 425, 429 (D.C. Cir. 2002). Although Lohrenz maintains that Donnelly and CMR should have pursued "easily available documentary or witness sources," Appellant's Br. at 42, and that it was improper for them to publish their allegations without seeing Lt. Lohrenz's full performance records, the records were not available without Lt. Lohrenz's consent, *see Lohrenz v. Donnelly*, 187 F.R.D. 1, 10 (D.D.C. 1999). Lohrenz has pointed to no authority establishing that publishers must withhold publication merely because they have not consulted particular documents, the procuring of which would effectively render the story's publication reliant on the subject's consent, and two district courts have reached a contrary conclusion. *See Secord v. Cockburn*, 747 F. Supp. 779, 788–89 & n.8 (D.D.C. 1990); *Loeb v. New Times Communications Corp.*, 497 F. Supp. 85, 93 (S.D.N.Y. 1980); *see also generally St. Amant*, 390 U.S. at 731. As the district court in *Loeb* observed, the "failure to verify statements with the plaintiff and reliance

upon some biased sources, in themselves, do not amount to reckless disregard of the truth." 497 F. Supp. at 93 (citing *St. Amant*, 390 U.S. at 730). Donnelly and CMR thus were not required to remain silent until the day Lt. Lohrenz agreed to disclose her confidential training records to them.

Furthermore, The Donnelly Report and CMR's press release embraced Donnelly's conclusions about Lt. Lohrenz but also reported that Navy officials held different views. Such admissions, i.e., reporting perspectives at odds with the publisher's own, "tend[ ] to rebut a claim of malice, not to establish one." *McFarlane*, 74 F.3d at 1304. Donnelly's and CMR's dissemination of the Navy's denials of Donnelly's conclusion about Lt. Lohrenz, combined with the reasonable implication that those denials tended to demonstrate the Navy's desire to conceal double standards even after confirming that at least Donnelly's allegations of a double standard were "substantially true," weighs against, rather than for, a finding of actual malice.

For these reasons, we hold that because no reasonable juror could find by clear and convincing evidence that Donnelly or CMR acted with actual malice in any of the four publications at issue, Lohrenz failed to meet her burden of proof.

Accordingly, we affirm the judgment of the district court, granting summary judgment to Donnelly and CMR.