# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued February 10, 2016         Decided May 10, 2016

No. 14-7171

MILAN JANKOVIC, ALSO KNOWN AS PHILIP ZEPTER,
APPELLANT

FIELDPOINT B.V. AND UNITED BUSINESS ACTIVITIES
HOLDING, A.G.,
APPELLEES

v.

INTERNATIONAL CRISIS GROUP, A NON-PROFIT
ORGANIZATION, ET AL.,
APPELLEES

Consolidated with 14-7178

Appeals from the United States District Court
for the District of Columbia
(No. 1:04-cv-01198)

*Rodney A. Smolla* argued the cause for appellant. With him on the briefs were *William T. O'Brien*, *Lisa Norbett Himes*, *John W. Lomas Jr.*, and *Malcolm I. Lewin*.

*Michael D. Sullivan* argued the cause for appellees. With him on the brief were *Thomas Curley*, *Mara J. Gassmann*, *Neil*

*H. Koslowe*, and *Jonathan Greenblatt*.

*Hashim M. Mooppan* was on the brief for *amici curiae* The Brookings Institution, et al. in support of defendants-appellees.

Before: HENDERSON, ROGERS and SRINIVASAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*:   Milan Jankovic, also known as Philip Zepter, sued the International Crisis Group ("ICG") for defamation based on a statement in one of its reports that linked him to the Slobodan Milosevic regime.  This is the third time this case is before the court.  We twice previously reversed the dismissal of the complaint and remanded the case.  *Jankovic v. Int'l Crisis Grp.* (*Jankovic I*), 494 F.3d 1080 (D.C. Cir. 2007); *Jankovic v. Int'l Crisis Grp.* (*Jankovic II*), 593 F.3d 22 (D.C. Cir. 2010).  In the first appeal, the court held that one statement in an ICG report was capable of defamatory meaning, and, in the second appeal, the court rejected ICG's defenses that the statement was merely an opinion or a fair report or comment on a government document.  Zepter now appeals the grant of summary judgment to ICG.  *Jankovic v. Int'l Crisis Grp.* (*Jankovic III*), 72 F. Supp. 3d 284 (D.D.C. 2014).  He contends that the district court erred in ruling that he was a limited-purpose public figure, and alternatively that, to the extent he was, the district court erred in finding that he failed to proffer evidence from which a reasonable jury could find by clear and convincing evidence that ICG published the defamatory statement with actual malice.

Upon *de novo* review, we hold that summary judgment was appropriately granted.  On the evidence before the district court, Zepter was a limited-purpose public figure with respect to the

public controversy surrounding political and economic reform in Serbia and integration of Serbia into international institutions during the post-Milosevic era. Contrary to his suggestion, he was not a mere bystander engaged in civic duties but was an advisor to and financial supporter of Prime Minister Zoran Djindjic, who came into power following Milosevic's ouster. Further, Zepter's mustering of evidence, deficient in part due to his procedural defaults, fails to show by clear and convincing evidence that ICG acted with actual malice in publishing the statement. Accordingly, we affirm.

## I.

This appeal arises out of publication by the International Crisis Group of *Serbian Reform Stalls Again* ("Report 145"), a report about reforms in the wake of the assassination of Prime Minister Zoran Djindjic. This report followed closely after ICG's publication of *Serbia After Djindjic* ("Report 141"). ICG, a non-profit, multinational organization with over 90 staff members on five continents published reports like these as part of its mission to influence policymakers and to prevent and resolve deadly conflict. *Jankovic I*, 494 F.3d at 1084–85. These two reports were primarily authored and researched by James Lyon, who was ICG's project director for Serbia from 2000 through 2005.

Briefly: In 1999, Serbia was marred by violence as its President, Slobodan Milosevic, carried out a pattern of ethnic violence in the Serbian province of Kosovo. These actions resulted in military intervention by the North Atlantic Treaty Organization ("NATO") and imposition of sanctions by the United States and European countries. Milosevic lost the presidency in a democratic election in 2000, but his successor, President Vojislac Kostunica, faced a politically powerful parliament led by Prime Minister Zoran Djindjic, who favored

sweeping changes of Milosevic's policies. In 2001, Prime Minister Djindjic extradited Milosevic to The Hague, Netherlands, to stand trial for war crimes. Prime Minister Djindjic was assassinated in 2003. *See Jankovic III*, 72 F. Supp. 3d at 292.

Report 145, as described by its principal author, addressed, among other things, the inability of the post-Milosevic Serbian government to achieve political and economic reform and to assert civilian control over the Milosevic-era police, military, and intelligence structures. It also analyzed continuing concerns about the influence of wealthy businessmen, some of whom were considered to have been closely connected to these power structures, on Serbia's fledgling democracy. ICG's concern was that without meaningful political and economic reform the prospect of further ethnic violence and national conflict in Serbia and the Balkans was likely.

As a successful businessman, Zepter was concerned about some of the negative statements ICG made about him in their reports. Born and raised in Serbia, Zepter established a successful cookware company after college and that business achieved success throughout Europe. *Jankovic III*, 72 F. Supp. 3d at 292. Over time, Zepter expanded his business into other areas, including banking, and he had banking interests in Serbia while Milosevic was in power. He filed suit, alleging that statements in the two ICG reports and an e-mail sent by the principal author of the reports were defamatory, but this court held that only claims related to a three-paragraph statement in Report 145 could proceed. *Jankovic I*, 494 F.3d at 1084. That statement described Zepter as a member of the "New Serbian Oligarchy" and stated, for example, that he was "associated with the Milosevic regime and benefitted from it directly." Report 145, at 17. It also stated that individuals like Zepter continued to be in positions of power and to enjoy access to public

resources, and that few of the "crony companies" had been subject to legal action despite promises by reformers. *Id.* at 17–18. The court concluded that a reasonable reader could construe the statement as asserting "that Philip Zepter, personally, was a 'crony' of Milosevic who supported the regime in exchange for favorable treatment" and "that Philip Zepter was actively in alliance with Milosevic and his regime." *Jankovic I*, 494 F.3d at 1091.

Having determined that the statement in Report 145 was capable of defamatory meaning, the court subsequently rejected ICG's defenses of fair report, fair comment, and opinion. *Jankovic II*, 593 F.3d at 26–28. ICG had supported portions of the statement with a list of frozen assets that was prepared by the U.S. Office of Foreign Assets Control ("OFAC"), and an accompanying Executive Order. *See id.* at 26–27. Although the list included the assets of a bank established by Zepter, the court held neither the fair report nor comment privileges applied because the list included the assets of all Serbian financial institutions, whether or not operated by Milosevic cronies. *See id.* at 26–27, 29. The court also rejected ICG's position that the statement was merely an opinion, concluding it was "sufficiently factual to be susceptible of being proved true or false." *Id.* at 27–28 (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990)). To the extent it might have been an opinion, the court concluded it was not privileged because the opinion's factual basis was not fully disclosed in the report. *See id.* at 28.

Upon remand, the parties filed motions for summary judgment. Zepter moved for partial summary judgment, seeking to establish that he was a private figure and that the defamatory passage was false. ICG moved for summary judgment on the grounds that Zepter was a limited-purpose public figure and he had failed to proffer sufficient evidence of actual malice. The district court agreed with ICG. *Jankovic III*, 72 F. Supp. 3d at

301, 316–17. In granting summary judgment to ICG, the district court took note of various procedural defaults that hindered Zepter's ability to meet his burden, including failing to seek timely discovery of Lyon's sources, *see id.* at 314 n.32, and to dispute some of ICG's material facts, *id.* at 290.

Zepter appeals the grant of summary judgment, and our review is *de novo*, *Lohrenz v. Donnelly*, 350 F.3d 1272, 1274 (D.C. Cir. 2003), while examining evidentiary and discovery rulings for abuse of discretion, *Morrison v. Int'l Programs Consortium, Inc.*, 253 F.3d 5, 9 (D.C. Cir. 2001).

## II.

The Supreme Court has long enshrined "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (internal citation omitted). An action for defamation can be maintained only to the extent it does not interfere with First Amendment rights of free expression. Thus, "a public official" may not "recover[] damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice,' that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–80. Since *New York Times*, the Court has explained that a similar rule applies to public figures, and, accordingly, speech relating to public officials and public figures, as distinct from private persons, enjoys greater protection under the First Amendment. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974); *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 154 (1967).

The Court has laid down broad rules about when a private individual becomes a public figure. Some individuals are public figures because they "occupy positions of such persuasive power and influence that they are deemed public figures for all purposes," but more commonly, private individuals become more limited-purpose public figures because they "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Gertz*, 418 U.S. at 345. The Court set the "dividing line between public and private figures based on those who assumed the risk of publicity and had access to channels of communication to defend themselves, and those who did not." *Lohrenz*, 350 F.3d at 1279 (citing *Gertz*, 418 U.S. at 344). Indeed, "[t]he communications media are entitled to act on the assumption that public officials and public figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them," whereas a private individual "has relinquished no part of his interest in the protection of his own good name, and consequently he has a more compelling call on the courts for redress of injury inflicted by defamatory falsehood." *Gertz*, 418 U.S. at 345. In setting these guidelines, the Court accommodated the competing concerns between a free press and a private person's need to redress wrongful injury, but has "been especially anxious to assure to the freedoms of speech and press that 'breathing space' essential to their fruitful exercise." *Id.* at 342 (citation omitted).

**A.**

Whether Zepter is a limited-purpose public figure or is a private figure is a "matter of law for the court to decide." *Tavoulareas v. Piro*, 817 F.2d 762, 772 (D.C. Cir. 1987); *see Rosenblatt v. Baer*, 383 U.S. 75, 88 n.15 (1966). Although *Gertz* ultimately controls the resolution of this question of law, this court employs a three-part inquiry first articulated in *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287,

1296–98 (D.C. 1980). *See Tavoulareas*, 817 F.2d at 772–73. First, the court must identify the relevant controversy and determine whether it is a public controversy. *Waldbaum*, 627 F.2d at 1296. Second, the plaintiff must have played a significant role in that controversy. *Id.* at 1297. Third, the defamatory statement must be germane to the plaintiff's participation in the controversy. *Id.* at 1298. In conducting this analysis, a court must be mindful that "the touchstone" of the limited-purpose public figure analysis remains determining "whether an individual has assumed [a] role[] of especial prominence in the affairs of society . . . [that] invite[s] attention and comment." *See Lohrenz*, 350 F.3d at 1279 (alterations in original) (quoting *Tavoulareas*, 817 F.2d at 773). Zepter contends that the district court erred at each step of the inquiry, and, in so doing, misunderstood the teachings of *Gertz*.

1. *Scope of Public Controversy.* A controversy is not a public controversy solely because the public is interested in it. *See Waldbaum*, 627 F.2d at 1296–97; *Time, Inc. v. Firestone*, 424 U.S. 448, 454 (1976). To determine whether there is a public controversy, the court "must examine whether persons actually were discussing some specific question," looking to "see if the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment." *See Waldbaum*, 627 F.2d at 1297. A controversy is a public one when a "reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution." *Id.*

The district court identified the public controversy as "the progress of political and economic reform in Serbia and the integration of Serbia into international institutions" in the post-Milosevic Serbian government, including the Prime Minister Djindjic regime. *Jankovic III*, 72 F. Supp. 3d at 301–03. Zepter does not dispute that this is a public controversy, but maintains

that there was a more specific controversy on which the district court needed to focus. In Zepter's view, the period when Djinjdic was in power was not relevant, and the public controversy should have been focused on "the progress of Serbian political and economic reform *after* the March 2003 assassination of Zoran Djindjic." Appellant's Br. 17. Zepter maintains this controversy is more appropriate because it is narrower, more directly tied to the report which contains the defamation, and compelled by law of the case and judicial estoppel.

When defining the relevant controversy, a court may find that there are multiple potential controversies, and it is often true that "a narrow controversy may be a phase of another, broader one." *See Waldbaum*, 627 F.2d at 1297 n.27. Indeed, courts often define the public controversy in expansive terms. *See Tavoulareas*, 817 F.2d at 773; *Waldbaum*, 627 F.2d at 1299. Although, as Zepter suggests, a broader public controversy may involve many more individuals, defining a public controversy broadly does not necessarily mean that too many individuals will be treated as public figures because the broader the controversy, the less likely it is for any individual to have had "the necessary impact" on that controversy. *See Waldbaum*, 627 F.2d at 1297 n.27. And whether an individual has a sufficient impact on the controversy is the second part of the *Waldbaum* inquiry and is not relevant to the threshold question of defining the public controversy.

Zepter's view that narrowing the definition of the controversy is required in order to relate it to the publication containing the defamation is not well taken. The court has defined controversies as being broader than the narrower discussion contained in the defamatory document, *see Tavoulareas*, 817 F.2d at 778–79; *Waldbaum*, 627 F.2d at 1290 & n.5, 1299, and Zepter offers no reason a different approach is

required here. Although Report 145 focuses on the reform effort *after* Prime Minister Djindjic's assassination in 2003, its discussion concerns the broader public debate about the reform effort after Milosevic was ousted from power in 2000. *See, e.g.*, Report 145, at i, 17–18. A report about the prospect of post-2003 reforms in Serbia contributes to both the narrow post-assassination issue and the broader discussion of post-2000 reforms.

Zepter's judicial estoppel and law-of-the-case arguments fare no better. Zepter fails to show ICG's positions regarding the scope of the controversy are inconsistent. ICG never argued in this court or the district court that the only relevant public controversy was related to the post-Djindjic assassination period, and its prior explanation in 2009 that Report 145 focused on the post-assassination period is consistent with its position now that the relevant public controversy was much broader. Judicial estoppel is therefore inapplicable. *See New Hampshire v. Maine*, 532 U.S. 742, 750 (2001). Also, in *Jankovic II*, the court did not address whether Zepter was a public figure and concluded only that "[t]he language at issue in this case appears in ICG's *Report 145*, which addresses the deceleration of Serbian reforms" after Prime Minister Djindjic's assassination. 593 F.3d at 24. There is no reason to think the court "affirmatively decided the issue" of the relevant public controversy. *See Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 739 (D.C. Cir. 1995).

2. *Role in Controversy*. For Zepter to be a limited-purpose public figure, he must have "thrust" himself to the "forefront" of the public controversy at issue. *Waldbaum*, 627 F.2d at 1297 (quoting *Gertz*, 418 U.S. at 345). Zepter maintains that the breadth of the controversy ensures that someone such as himself — a mere businessman interested in civic affairs — could not have been expected to have the requisite impact. Appellant's

Br. 22–30. After all, a broad controversy "will have more participants" such that it is unlikely any one individual "can have the necessary impact." *Waldbaum*, 627 F.2d at 1297 n.27. In *Gertz*, the Supreme Court cautioned against concluding that an individual was a public figure for all purposes solely because of activity in "community and professional affairs" and declined to treat that individual as a public figure for a limited controversy in the absence of evidence that he had "thrust himself into the vortex of" any relevant public issue or "engage[d] the public's attention in an attempt to influence its outcome." *Gertz*, 418 U.S. at 351–52; *see Hutchinson v. Proxmire*, 443 U.S. 111, 134–35 (1979).

The evidence eliminates the risk that Zepter was merely an ordinary civic participant and private person who has been mischaracterized as a limited-purpose public figure. It shows that he was was an outspoken supporter, financial backer, and advisor of Prime Minister Djindjic. Zepter now steps back from his statement to the press regarding his advisory role, but he does not deny that he paid over $100,000 to a lobbyist to support Prime Minister Djindjic's effort to improve relations between the United States and Serbia. Returning from a trip to the United States in late November 2001, Djindjic announced that the United States had promised assistance in writing off two-thirds of Yugoslavia's 12.2 billion dollar external debt and rescheduling the remainder. In an open letter of December 30, 2001, to the Serbian people, entitled "My Answer to Them," which was published on the front page of two Serbian newspapers, Zepter emphasized that he had long been a supporter of Djindjic and of reform in Serbia and announced: "When, in a few years, I enter [the] political arena, I will enter to win." In various interviews with members of the Balkan press, Zepter repeated these views, including acknowledging in an article published in the fall 2003 in *Nacional (Croatia)* that he had given advice to Prime Minister Djindjic and paid for a

lobbyist to improve relations between the United States and Serbia.

Thus, Zepter was "purposely trying to influence the outcome or could realistically have been expected, because of his position in the controversy, to have an impact on its resolution." *Waldbaum*, 627 F.2d at 1297; *see Gertz*, 418 U.S. at 345. The evidence shows that Zepter had voluntarily thrust himself into ensuring that Serbia underwent reforms in the post-Milosevic era. He attained "a position in the limelight" through "purposeful action[s] of his own." *See Lohrenz*, 350 F.3d at 1280 (quoting *Gertz*, 418 U.S. at 345). His actions ensured that he would play a central role in the reform, and he "engaged in conduct that he knew markedly raised the chances that he would become embroiled in a public controversy." *Clyburn v. New World Commc'ns, Inc.*, 903 F.2d 29, 33 (D.C. Cir. 1990); *Lohrenz*, 350 F.3d at 1280. His close political relationship with Prime Minister Djindjic carried a risk of public scrutiny. *See Clyburn*, 903 F.2d at 33; *Waldbaum*, 627 F.2d at 1292, 1298; *Thompson v. Evening Star Newspaper Co.*, 394 F.2d 774, 776 (D.C. Cir. 1968); *Rebozo v. Wash. Post Co.*, 637 F.2d 375, 379–80 (5th Cir. 1981). His public actions invited press scrutiny in view of the public discussion regarding the impact that businessmen of his stature would have on reform during and after the Djindjic regime. It is little wonder that a prominent businessman's close ties to Prime Minister Djindjic achieved "special prominence" in the debate about reform in Serbia. *See Waldbaum*, 627 F.2d at 1297.

The three sworn statements proffered by Zepter from prominent individuals with knowledge of Serbia — a former U.S. Ambassador to Yugoslavia, a Djindjic-appointed Assistant Minister of Foreign Affairs, and a former ICG employee — are unhelpful to him. The former ICG employee had no knowledge of Zepter whatsoever, and the other two had no knowledge of

Zepter being involved in the political or economic affairs of Prime Minister Djindjic. One understood Zepter simply to be a personal friend of the Prime Minister. But such close personal friendships can carry with them the risk of being swept up into a public controversy. *See Clyburn*, 903 F.2d at 32–33; *Rebozo*, 637 F.2d at 379. Further, these individuals do not contradict the evidence that Zepter was more than just a close personal friend, even paying for a lobbyist to advance Serbia's interests, as defined by Prime Minister Djindjic, in the United States.

The evidence already described disposes of Zepter's view that the only evidence offered in support of his status as a limited-purpose public figure are unreliable Serbian press articles and his purely defensive statements to the press. In suggesting that relying on Serbian news sources for their truth was error in view of their unreliability and potential hearsay problems, Zepter ignores that he failed to offer evidence that the particular articles on which the district court relied were untrue. Under the local rules, uncontested facts may be taken as true for purposes of summary judgment. *See Jankovic III*, 72 F. Supp. 3d at 290 & n.3 (citing Local Civ. R. 7(h) and *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 153 (D.C. Cir. 1996)). Although there was evidence that the reliability of the Serbian press, generally, was subject to question, the evidence did not indicate it was categorically unreliable; rather, articles could be evaluated on a case-by-case basis and, according to Lyon, could be a "useful barometer of public sentiment, or some portion of it, as well as at times convey accurate information," Lyon Decl.¶ 51 (Mar. 29, 2013). News sources can play a central non-hearsay role in this part of the inquiry. *See Waldbaum*, 627 F.2d at 1297, 1290 n.3; *see also Tavoulareas*, 817 F.2d at 773–74. In any event, relevant content in the news stories is supported by evidence that Zepter could hardly dispute or label as hearsay, including the lobbyist's deposition testimony on the intended effect of his lobbying and

Zepter's own view of his role as contributing to the transition of the Serbian government.  *See* Denton Dep. Tr. 13–19, 95–97 (Dec. 14, 2011); Milan Jankovic, "My Answer to Them," *Glas Jovnosti*, Dec. 30, 2001, at 4 (Eng. translation).

On the other hand, it is true that "responding to press inquiries or attempting to reply to comments on oneself through the media does not necessarily mean that [one] is attempting to play a significant role in resolving a controversy." *Waldbaum*, 627 F.2d at 1298 n.31; *see also Clyburn*, 903 F.2d at 32–33.  So, the court does not give great weight to a plaintiff's press statements when the statements "merely answer the alleged libel itself" or consist of "purely defensive, truthful statements made when an individual finds himself at the center of a public controversy but before any libel occurs." *See Clyburn*, 903 F.2d at 32.  Zepter, however, used the public controversy to do more than provide a "short simple statement of his view of the story," and instead drew "attention to himself" and used "his position in the controversy 'as a fulcrum to create public discussion.'" *See id.* (quoting *Wolston v. Reader's Digest Ass'n*, 443 U.S. 157, 168 (1979)); *Tavoulareas*, 817 F.2d at 773–74; *Time*, 424 U.S. at 454 n.3.  His open letter to the Serbian People was more than a mere defensive statement as it expressed his continued support for the political regime headed by Prime Minister Djindjic and explained his own future political ambitions.  This goes "beyond an ordinary citizen's response to the eruption of a public fray around him." *Clyburn*, 903 F.2d at 33.  Moreover, the conduct that Zepter acknowledged to the press — acting as an advisor and financier of the Serbian reform effort — makes him a limited-purpose public figure, and it was that conduct, and not the negative stories, that involved him in the public controversy. *See id.* at 33.  Zepter's choosing to involve himself in reform — through his supportive public statements and the payment of a lobbyist — is what gave him "special prominence" in the public controversy.

3. *Germaneness.* For Zepter to have been a limited-purpose public figure, the defamatory statement must be "germane to the plaintiff's participation in the controversy." *Waldbaum*, 627 F.2d at 1298. "Misstatements *wholly unrelated* to the controversy" are not protected, but statements, including those highlighting a plaintiff's "talents, education, experience, and motives," can be germane. *Id.* (emphasis added).

To Zepter, the defamation regarding his possible relationship to Milosevic could not relate to his role in a public controversy focused on the period *after* Milosevic was no longer in power. Yet even if Zepter was an important figure in the Serbian reform effort mainly due to his relationship with Prime Minister Djindjic, his relationship to Milosevic is relevant to Zepter's role in the controversy. Linking Zepter to Milosevic would be relevant to understanding Zepter's role and why he wanted to be involved in the reform effort led by Prime Minister Djindjic. The germaneness test is met because the defamatory statement relates to the individual's role in the public controversy.

Also according to Zepter, ICG has not offered sufficient evidence of a relationship between Zepter and Milosevic for the defamatory statement to be germane. But the germaneness part of the *Waldbaum* inquiry is not the place to debate whether the statement is true or even well-supported. Those questions are relevant to the actual malice inquiry. The purpose of the germaneness inquiry is to ensure that the allegedly defamatory statement — whether true or not — is related to the plaintiff's role in the relevant public controversy. This ensures that publishers cannot use an individual's prominence in one area of public life to justify publishing negligent falsehoods about an unrelated aspect of the plaintiff's life. *See Waldbaum*, 627 F.3d at 1298.

**B.**

As a limited-purpose public figure, Zepter can prevail on his defamation claim only if he "proves that the statement was made with 'actual malice' — that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *See New York Times*, 376 U.S. at 279–80. A defendant has acted recklessly if "the defendant in fact entertained *serious doubts* as to the truth of his publication" or acted "'with a high degree of awareness of . . . probable falsity.'" *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (emphasis added) (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)). The plaintiff can "prove the defendant's subjective state of mind through the cumulation of circumstantial evidence, as well as through direct evidence." *Tavoulareas*, 817 F.2d at 789. But it is not enough to show that defendant should have known better; instead, the plaintiff must offer evidence that the defendant in fact harbored subjective doubt. *See McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1508 (D.C. Cir. 1996). The plaintiff can make this showing, for example, by offering evidence that "it was highly probable that the story was '(1) fabricated; (2) so inherently improbable that only a reckless person would have put [it] in circulation; or (3) based wholly on an unverified anonymous telephone call or some other source that [defendant] had obvious reason to doubt.'" *Lohrenz*, 350 F.3d at 1283 (quoting *Tavoulareas*, 817 F.2d at 790); *see also St. Amant*, 390 U.S. at 732; *Clyburn*, 903 F.2d at 33. In view of the important values enshrined in the First Amendment, the Constitution further protects publishers by requiring that plaintiffs prove actual malice by clear and convincing evidence. *See Gertz*, 418 U.S. at 342; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 244 (1986).

**1**. To prevail on summary judgment, and now on appeal, Zepter must show that "the evidence in the record could support a reasonable jury finding . . . that [he] has shown actual malice

by clear and convincing evidence." *Anderson*, 477 U.S. 255–56. As the non-moving party, he is entitled to the benefit of all "justifiable inferences" in his favor and "need only present evidence from which a jury might return a verdict in his favor." *See id.* at 254–55, 257. He is also entitled to the benefit of the aggregate of the evidence. *See Lohrenz*, 350 F.3d at 1283; *Tavoulereas*, 817 F.2d at 794 n.43. Nonetheless, because of the heightened burden imposed by the clear and convincing standard and the challenges associated with offering evidence about state of mind, this standard is not easily met, even at summary judgment. *See Lohrenz*, 350 F.3d at 1283. The "standard of actual malice is a daunting one," *McFarlane*, 91 F.3d at 1515 (quoting *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1308 (D.C. Cir. 1996)), and "[f]ew public figures have been able clearly and convincingly to prove that the scurrilous things said about them were published by someone with 'serious doubts as to the truth of his publication.'" *Id.* (quoting *St. Amant*, 390 U.S. at 731).

Although the serious doubt inquiry "is too fact-bound to be resolved on the basis of any single factor or mechanical test," *see Tavoulereas*, 817 F.2d at 788, several principles guide the analysis. For example, "actual malice does not automatically become a question for the jury whenever the plaintiff introduces pieces of circumstantial evidence tending to show that the defendant published in bad faith." *Id.* at 789. Nor is it enough for the plaintiff to offer evidence of "highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 664–65 (1989) (citation omitted); *Clyburn*, 903 F.2d at 33. Nor, further, does it suffice for a plaintiff merely to proffer "purportedly credible evidence that contradicts a publisher's story." *Lohrenz*, 350 F.3d at 1284. Rather, it is only when a plaintiff offers evidence that "a defendant has reason to doubt

the veracity of its source" does "its utter failure to examine evidence within easy reach or to make obvious contacts in an effort to confirm a story" demonstrate reckless disregard. *McFarlane*, 91 F.3d at 1509. Absent such concerns, the defendant has no duty to corroborate the defamatory allegation. *See id.* Even "ill will toward the plaintiff or bad motives are not elements of actual malice," and "such evidence is insufficient by itself to support a finding of actual malice." *Tavoulareas*, 817 F.2d at 795. That is, "a newspaper's motive in publishing a story — whether to promote an opponent's candidacy or to increase its circulation — cannot provide a sufficient basis for finding actual malice." *Harte-Hanks Commc'ns*, 491 U.S. at 665. Only when the evidence of ill will or bad motive is also probative of a "willingness to publish *unsupported allegations*" is it suggestive of actual malice. *See Tavoulareas*, 817 F.2d at 796.

**2**. Zepter contends that a reasonable jury could find that ICG published the defamatory statement in Report 145 with actual malice. He points to a series of circumstances that individually or collectively, he maintains, would permit a reasonable jury to find that ICG's statement was based on a mere assumption that there was continuing influence of the Milosevic oligarchy during and after the Djindjic regime, and that ICG's lack of evidence that Zepter was a Milosevic crony demonstrates that it published the statement with actual malice. *See Jankovic I*, 494 F.3d at 1091. As he puts it, the principal author of Report 145, Lyon, "self servingly claims to have *assumed* that any financially successful person from Serbia must have been a Milosevic crony," and his "claim is all the more unwarranted in light of evidence showing that Lyon pursued a scheme to extort Zepter." Appellant's Br. 9. The view that Report 145's defamatory statement was based on a mere assumption ignores key portions of Lyon's declaration, which explains his research process and that his conclusion was not a

mere assumption but based on information gathered from various sources. ICG's other conduct on which Zepter relies, including Lyon's attempted extortion, does not rise to the level of clear and convincing evidence of actual malice.

Because Lyon was the principal author of Report 145 and Zepter maintains that nothing that ICG points to supports the defamatory statement, it bears setting out the particulars of Lyon's declaration. ICG maintains that it had and continues to have a good faith belief that the defamatory statement is true, explaining the process for gathering information for Report 145 and the basis for concluding that Zepter was aligned with the Milosevic regime. ICG — including ICG's Vice President in charge of research with over 30 years at the U.S. State Department and another former ICG employee with thirty years' experience in foreign affairs — considered Lyon to be an expert on the area and to be one of ICG's best analysts. Lyon had devoted his professional life to the study of the Balkans, had a Ph.D in Balkan history from the University of California, Los Angeles, and had extensive experience from living and working in, and conducting research on, the Balkans. He spent approximately two months researching, interviewing, and drafting Report 145, which underwent further editing upon his supervisor's review and upon subsequent review by the director of research, and the report was ultimately approved by ICG's president. In view of Lyon's extensive reporting and research, ICG was confident in the truthfulness of its report.

Although the precise source for the defamatory statement was not made clear in Report 145, Lyon explained that his conclusion that Zepter was a Milosevic crony was based on prior ICG reports, interviews he had conducted, Balkan press reports, a report purporting to be from the Office of the High Representative ("OHR") formed to implement the Dayton Peace Agreement, and the OFAC frozen assets list. Lyon Decl.

¶¶ 27–67. Through reviewing or researching ICG's prior reports (Reports 115, 118, 126, and 141), Lyon had become familiar with Zepter and had come to believe that Zepter's banks were in league with the Milosevic regime in view of the role such banks might have played in aiding the regime by controlling cash flows in Serbia and neighboring Republika Srpska ("RS"). *Id.* ¶¶ 27–39. Additionally, he conducted many interviews with officials associated with Balkan governments and the embassies of the NATO powers that intervened in the region as well as businessmen in the area. *Id.* ¶¶ 40–41. Although the precise identities of these sources remain confidential, Lyon stated each had previously proven to be reliable and that he had confidence in the information they were providing. *Id.* ¶¶ 48–50. From these interviews with confidential sources, Lyon concluded that "it was impossible during the Milosevic era to have amassed significant wealth without the sponsorship of, or direct assistance from, the regime or its security services." *Id.* ¶ 42. He had been told by a local government source that Zepter had access to privileged currency rates and "was among those who had profited handsomely under the [Milosevic] regime." *Id.* ¶ 45. He had also been told by many intelligence and diplomatic sources that Zepter and his businesses were believed to be engaged in money laundering and arms dealing, that he had ties to "Milosevic's state security apparatus[,] and that Zepter's company had been formed with capital from a state-owned company controlled by Milosevic." *Id.* ¶¶ 48–49. Lyon acknowledged being encouraged in his conclusion by the fact that questions were being raised by the Balkan press about the source of Zepter's wealth and his ties to the Milosevic regime. *Id.* ¶ 52. Lyon also received from a NATO intelligence source a report purporting to be from the OHR that supported his conclusion Zepter was engaged in criminal wrongdoing and was associated with Milosevic. *Id.* ¶¶ 52, 57, 60–61. Finally, Lyon also relied on the fact that the OFAC had included Zepter Bank on a list of entities whose assets should be frozen. *Id.* ¶¶ 64–65.

This bolstered Lyon's conclusion that the bank had close ties to the Milosevic regime. *Id.* ¶¶ 65–67. Because his research revealed that it was not "possible that any significant commercial entity, particularly a bank, could operate independently of [the Milosevic] regime," Lyon believed that the bank's assets were frozen due to its relationship with the Milosevic government. *Id.* ¶ 67.

Zepter maintains, Lyon's declaration aside, that the record supports an inference that ICG did not rely on any sources outside of the OFAC frozen assets list. Because ICG previously represented to this court in 2009 that the defamatory statement was either purely an opinion, or at least an opinion fully supported by the frozen assets list, a jury could infer that ICG did not actually rely on the other sources referenced in Lyon's declaration, which was not prepared until 2013. Given the court's conclusion that the factual basis for the defamatory statement had not been disclosed to the reader as a result of "ICG falsely stat[ing] the basis for the frozen assets lists," *see Jankovic II*, 593 F.3d at 28, Zepter maintains the court must hold that Lyon had no other basis for the defamatory statement and that therefore the defamatory statement was merely an unsubstantiated opinion based on a mere assumption.

Zepter overreads *Jankovic II*. ICG's defense that the defamatory statement was an opinion does not necessarily mean it had no other factual basis for the statement. Nor did this court hold that ICG's only basis for the defamatory statement was the frozen asset list. Rather, the court concluded that the statement did not deserve protection "under the doctrine that 'a statement of opinion that is based upon true facts that are revealed to readers'" is not actionable. *See id.* (citation omitted). Nothing revealed to the readers of Report 145 — including the OFAC list — sufficed to fully support the defamatory statement. *See id.* ICG had not, however, argued that its only factual support for

the statement was the frozen assets list but that the frozen assets list supplied a fully disclosed basis for supporting the statement. This left open the possibility that ICG had other sources undisclosed in the Report to support the defamatory statement.

Zepter is correct that the court cannot consider one source on which Lyon purports to rely – the OHR Report. The district court ruled ICG was judicially estopped from relying on this evidence. *Jankovic III*, 72 F. Supp. 3d at 317 n.37. On appeal, ICG has failed to present more than cursory argument, in a footnote and without case citations, that this was error, Appellee's Br. 46–47 n.10. The court does not consider the merits of such underdeveloped arguments, thereby leaving that ruling in place. *See Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008); *Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 869 (D.C. Cir. 2001).

Zepter maintains further, however, that even if a jury could believe that Lyon relied on each of the sources he mentioned in his declaration, there were "obvious reasons to doubt" their accuracy or reliability. *See, e.g.*, *McFarlane*, 91 F.3d at 1513 (citation omitted); *Lohrenz*, 350 F.3d at 1284–85. He focuses on why the OFAC listing and Serbian press are unreliable, but he nowhere suggests there was any reason for Lyon to doubt ICG's prior reports or his confidential sources, each of which support the defamatory statement. Zepter's counsel emphasized during oral argument that, unlike the precedents on which ICG relies, ICG has never revealed the identity of its confidential sources or otherwise provided the specific basis for the defamatory statement. True, but this gets Zepter only so far. Zepter's failure to learn the identity of the confidential sources was due, at least in part, to his untimely discovery request. *See Jankovic III*, 72 F. Supp. 3d at 315 n.32. The only record evidence is that Lyon had confidence in what these sources told him based on their past reliability. Lyon Decl. ¶¶ 48–50.

And there is no merit to Zepter's argument that ICG could not rely on confidential sources because ICG had failed to disclose their identity to him. *See* Appellant's Br. 51–52. Where, as here, "the primary source of evidence is the reporter's own (naturally self-interested) testimony of what a confidential source told him, the combination of the burden of proof and the reporter's privilege to withhold the source's identity confront a defamation plaintiff with unusual difficulties." *Clyburn*, 903 F.2d at 35. But the court also recognized that "the reporter's privilege is a qualified one," because a plaintiff may be able to compel a reporter to divulge his sources if the plaintiff "exhausts all reasonable alternative means of identifying the source." *Id.* (citing *Zerilli v. Smith*, 656 F.2d 705, 713–14 (D.C. Cir. 1981), and *Carey v. Hume*, 492 F.2d 631, 639 (D.C. Cir. 1974)). In the cases on which Zepter relies, the defendant was precluded from relying on the confidential sources after a court had determined that the reporter's privilege gave way and that precluding the defendant from relying on such sources was an attractive alternative remedy to requiring the reporter to reveal a source's identity. *See, e.g.*, *Dowd v. Calabrese*, 577 F. Supp. 238, 244 (D.D.C. 1983). Zepter is not at that point, for his motion to compel disclosure was denied because he filed it after the time for discovery had closed. *Jankovic III*, 72 F. Supp. 3d at 315 n.32; *see also Jankovic v. Int'l Crisis Grp.*, No. 04-1198, slip op. at 4 (D.D.C. Sept. 4, 2014). On appeal, Zepter makes only a cursory argument this was error, in a footnote to his brief. The court does not consider such arguments, *see Am. Wildlands*, 530 F.3d at 1001; *Cement Kiln*, 255 F.3d at 869, as Zepter does not attempt to explain why the district court abused its discretion in refusing to permit untimely discovery when he could have sought production during the discovery period. As in *Clyburn*, Zepter's "failure to offer evidence of actual malice" with respect to the confidential sources "must be charged squarely to him." *See* 903 F.2d at 35.

Zepter's failure to offer evidence casting doubt on ICG's good faith reliance on these confidential sources leaves no basis for a reasonable inference that Lyon had not supported the defamatory statement with such sources. This may well prevent Zepter from proving actual malice, *see, e.g.*, *Liberty Lobby, Inc. v. Dow Jones & Co., Inc.*, 838 F.2d 1287, 1297–98 (D.C. Cir. 1988); *McFarlane*, 91 F.3d at 1513; *Tavoulareas*, 817 F.2d at 790. *See also St. Amant*, 390 U.S. at 731–32. But Zepter is entitled to the benefit of the aggregate effect of evidence relevant to showing ICG acted with actual malice. *See Lohrenz*, 350 F.3d at 1283; *Tavouloreas*, 817 F.2d at 794 n.43. He maintains that other circumstances relating to Report 145 could still convince a jury that Lyon did not rely on these confidential sources. Zepter focuses on Lyon's other sources where there is evidence of unreliability as well as a series of editorial missteps by ICG, and Lyon's attempted extortion.

First, Zepter maintains that a jury could find that it was reckless for ICG to rely on the Serbian press because ICG recognized that some Serbian press outfits were "sensationalist bordering on libel" and others were "notorious for spreading rumours and outright lies," Report 145, at 9–10. Zepter, however, exaggerates the role the Balkan press played in Lyon's reporting, as his declaration's greater reliance on confidential sources demonstrates. As in *McFarlane*, 91 F.3d at 1513, even though Lyon had reason to be "wary" of the press reports, "he also had some reason to believe the story, based upon his own research and his conversations with journalists and experts" on Balkan affairs. *See also Tavoulareas*, 817 F.2d at 790. Any potential bias associated with the news reports, "does not detract from the reliability" of the confidential sources. *See Clyburn*, 903 F.2d at 34. And disclosure in Report 145 of the potential unreliability of the press reports would tend to dispel any claim of actual malice. *See McFarlane*, 74 F.3d at 1304.

Second, Zepter maintains that a reasonable jury could find actual malice based on ICG's negligence in overreading the OFAC frozen asset list to support the defamatory statement. This court concluded that ICG's reliance was misplaced because the listing did not mean that "Zepter Banka gave 'support' to Milosevic, and that its U.S. assets were frozen because of that support." *Jankovic II*, 593 F.3d at 27. But that is not the same as showing that ICG knowingly published a false statement or subjectively doubted that the list justified the conclusion at the time Report 145 was issued. What is relevant to malice is the information "that was available to and considered by [ICG] prior to publication." *McFarlane*, 91 F.3d at 1508. Even if the Executive Order accompanying the OFAC list did not reflect ICG's understanding of the list, the inferences in Zepter's favor end with a showing that ICG honestly, if mistakenly believed that the OFAC listing was evidence of Zepter's support for the Milosevic regime. An honest misinterpretation does not amount to actual malice even if the publisher was negligent in failing to read the document carefully. *Cf. Time, Inc. v. Pape*, 401 U.S. 279, 289–92 (1971); *Bose Corp.* v. *Consumers Union of U.S., Inc.*, 466 U.S. 485, 512 (1984).

Third, Zepter's reliance on insufficient investigation by ICG is a non-starter. Only if "a defendant has reason to doubt the veracity of its source" is its "failure to examine evidence within easy reach or to make obvious contacts" evidence of its reckless disregard. *See McFarlane*, 91 F.3d at 1510. Lyon had not discovered anything that caused him to doubt his conclusion about Zepter, and therefore was under no obligation to investigate further. *See Lohrenz*, 350 F.3d at 1284–85; *McFarlane*, 91 F.3d at 1510; *Masson v. New Yorker Magazine, Inc.*, 960 F.2d 896, 901 (9th Cir. 1992); *see also St. Amant*, 390 U.S. at 732–33. "Even where doubt-inducing evidence could be discovered, a publisher may still opt not to seek out such evidence and may rely on an informed source, so long as there

is no 'obvious reason to doubt' that source." *Lohrenz*, 350 F.3d at 1285. Zepter has not identified any such evidence that ICG might have easily discovered, other than possibly from speaking with Zepter himself. That Lyon did not contact Zepter, who might reasonably be expected to deny that he was a Milosevic crony, is neither surprising nor required. *See McFarlane*, 91 F.3d at 1510–11; *Lohrenz*, 350 F.3d at 1286.

Fourth, ICG's purported deviations from its normal operating procedures are no more suggestive of actual malice. Zepter highlights ICG's use of an intern to fact check, which is unremarkable, and this, along with ICG's departures from its style and procedures guidelines, does not amount to "purposeful avoidance of the truth." *See Harte-Hanks Commc'ns*, 491 U.S. at 692. Whether these procedures were regularly followed is up for debate, but departures from the normal procedure would, at most, constitute evidence of "highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." Even less does mere sloppy journalism constitute clear and convincing evidence that ICG acted with actual malice. *See Lohrenz*, 350 F.3d at 1284 (quoting *Harte-Hanks Commc'ns*, 491 U.S. at 666).

Fifth, Zepter emphasizes that anyone familiar with Serbia would recognize the inherent improbability of an outspoken supporter of Prime Minister Djindjic having previously been a Milosevic supporter. This posits a false dichotomy. *See Jankovic III*, 72 F. Supp. 3d at 313. The evidence shows that it was neither unheard of for a former Milosevic supporter to shift alliances, such that Lyon and ICG would have been breaking new ground in concluding that Zepter had done exactly that, nor that anyone at ICG thought this possibility particularly unlikely. Shifting alliances were thought to be common, as illustrated by the example of a Milosevic security chief joining the post-

Milosevic government. And according to the President of ICG, there was nothing inconsistent about "someone having been close to the Milosevic regime but nonetheless at the same time being close to people who were, with varying degrees of capacity and intent, trying to forge a new regime for Serbia." Evan Garth Dep. Tr. 346 (Oct. 26, 2011). Maybe Zepter should not have been considered by ICG to be among those who switched allegiances, but he has pointed to no evidence that ICG staff would have been subjectively aware that it was inherently improbable that he had done so.

Sixth, Zepter points to the evidence that Lyon attempted to extort money from him, something he waited some nine years after its alleged occurrence to mention. During a meeting with Lyon, either before or after Report 145 was issued, Zepter claimed that Lyon said Zepter could get him to stop writing negative stories about him if he paid Lyon one to two million dollars. Zepter Dep. Tr. 308–09 (Mar. 15, 2012). On summary judgment, the court must assume that the extortion attempt occurred. *See* Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 255; *cf. Robinson v. Pezzat*, No. 15-7040, 2016 WL 1274044, at \*6–7 (D.C. Cir. Apr. 1, 2016). Zepter suggests a reasonable jury could find that Lyon's motive to extort undermined the credibility of Lyon's work and offered an incentive for him to write untrue reports.

Keeping in mind that "speech 'honestly believed,' whatever the speaker's motivation, 'contribute[s] to the free interchange of ideas and the ascertainment of truth,'" *Tavoulareas*, 817 F.2d at 795 (alteration in original) (quoting *Garrison*, 379 U.S. at 73), Zepter is nonetheless correct that in some circumstances motive-based evidence can be probative of actual malice, *see id.* But the mere presence of some ulterior motive — whether a profit motive, a motive to produce the most interesting stories, or a personal desire to harm the subject of a story — is not enough

to support a finding of actual malice. *See Harte-Hanks Commc'ns*, 491 U.S. at 666–68; *Tavoulareas*, 817 F.2d at 795–97, *accord Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 511 (1991). This is so even though such motives may naturally provide publishers with an incentive to achieve an end without regard to the truth of what they publish. *See Tavoulareas*, 817 F.2d at 797. Absent evidence that the publisher's alleged motive shows an "intent to inflict harm through falsehood," a "willingness to publish *unsupported allegations*," or a desire to publish "*with little or no regard for* [the report's] *accuracy*," the plaintiff has not produced motive-based evidence probative of actual malice. *See id.* at 795–97 (citation omitted); *see also Harte-Hanks Commc'ns*, 491 U.S. at 667. This is true even where the plaintiff introduces evidence that the publisher engaged in "contemptible" conduct in reporting the story, for example, by asking someone to steal documents in support of a story. *See Tavoulareas*, 817 F.2d at 796.

For the attempted extortion to be clear and convincing evidence from which a reasonable jury could find actual malice, Zepter must proffer evidence not only that Lyon prepared Report 145 with an extortion motive in mind, but also that the extortion motive caused ICG or Lyon to risk publishing an *untrue* statement about him. Zepter's evidence fails to establish the latter, at least by clear and convincing evidence. All Zepter has shown is that Lyon hoped to capitalize on working on reports about the Balkans. That evidence, without more, does not amount to evidence that Lyon was willing to publish untruths in order to make an extra buck. *See Tavoulareas*, 817 F.2d at 796–97. Such evidence is not inevitably clear and convincing evidence of actual malice. A reporter might be equally, if not more, successful in blackmailing someone with true information, so the fact of extortion does not categorically allow the inference that Lyon intended to extort Zepter with

falsehoods. In fact, Zepter's own recounting of the extortion attempt significantly downplays the plausibility of such an inference. The only evidence shows that Lyon's motive to extort was consistent with blackmailing individuals with reports he believed to be true. When Zepter asked Lyon to stop publishing "lies," Lyon responded that he believed what he wrote was true and that he had reliable sources to prove it. Zepter Dep. Tr. 308. In view of all of the other evidence supporting Lyon's conclusion about Zepter and the evidence that ICG had a strong motive to publish truthful, carefully prepared reports that were even better than many embassy reports, *see* Jon Greenwald Dep. Tr. at 163–64 (Jun. 10, 2011), no reasonable jury could find that Lyon's extortion attempt indicated he published a falsehood either willingly or recklessly, much less that there was such clear and convincing evidence.

The district court declined to consider Zepter's proffered declarations providing hearsay accounts of Lyon's attempts to extort others who were the subject of ICG reports. *Jankovic III*, 72 F. Supp. 3d at 318 (citing Fed. R. Civ. P. 56(c)(4); Fed. R. Evid. 403, 404(a)(1)). Zepter offered these declarations only to "show reputation concerning character" generally, and so even were these declarations in evidence, they would do no more to establish that Lyon was willing to publish without regard to truth or falsity in order to extort. There is no need, then, to consider whether it was an abuse of discretion to exclude these declarations.

Seventh, for a similar reason, Zepter's related argument that Lyon had concocted a pre-conceived storyline by which all wealthy Serbian citizens were Milosevic cronies also fails to establish actual malice. Lyon may have adopted an adversarial stance toward these wealthy citizens he had come to believe were deserving of suspicion, but this attitude is not "antithetical to the truthful presentation of facts." *See Tavoulareas*, 817 F.2d

at 795.

For these reasons, we conclude that, despite weaknesses in some sources on which ICG relied and viewing the evidence in his favor, Zepter has failed to establish that "the defendant actually possessed subjective doubt" about the statement published in Report 145. *See McFarl*ane, 91 F.3d at 1508. Owing in part to his procedural failings during discovery and at summary judgment, Zepter has not pointed to evidence that there were obvious reasons to doubt the confidential sources or that ICG or Lyon had discovered evidence causing them to doubt the conclusion that Zepter was allied with the Milosevic regime. Absent such evidence from Zepter, the record evidence of Lyon's extensive background research and reporting on the Balkans, his understanding of the Serbian press, and his good faith belief that the frozen assets list implied more than it actually did, belies actual malice. This is particularly so in view of evidence showing that ICG's report underwent multiple internal reviews by knowledgeable staff. Evidence of ICG's missteps and preconceived notions about Zepter's Milosevic years does little to show actual malice. And although Zepter's evidence of Lyon's attempted extortion shows poor judgment and is hardly admirable conduct for a reporter, *see Tavoulareas*, 817 F.2d at 796, even that evidence fails to show that Lyon risked writing "lies" or was motivated to do so. Separately, then, each of Zepter's factual theories fails to show clear and convincing evidence of actual malice.

Zepter's theories fare no better when viewed in the aggregate. Even taking these flawed evidentiary assertions together, no reasonable jury could find by clear and convincing evidence that ICG acted with actual malice. *See McFarlane*, 91 F.3d at 1516. What is still missing is evidence that ICG had "serious doubts" about the truth of the defamatory statement or that it published the statement with a high degree of awareness

of its probable falsity, such that ICG acted with reckless disregard for the statement's truth. *See St. Amant*, 390 U.S. at 730.

Accordingly, we hold that Zepter has failed to establish clear and convincing evidence of actual malice, and we affirm the grant of summary judgment to ICG.