# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued December 2, 2016          Decided May 9, 2017

No. 16-7033

YORIE VON KAHL,
PLAINTIFF-APPELLEE

v.

BUREAU OF NATIONAL AFFAIRS, INC.,
DEFENDANT-APPELLANT

---

Consolidated with 16-7034

---

Appeals from the United States District Court
for the District of Columbia
(No. 1:09-cv-00635)

---

*Laura R. Handman* argued the cause for defendant-appellant/cross-appellee. With her on the briefs were *Lisa B. Zycherman* and *Jay Ward Brown*.

*Kevin T. Baine*, *Thomas G. Hentoff*, *Nicholas G. Gamse*, *Charles D. Tobin*, *Jonathan Hart*, *Jonathan Donnellan*, *Kristina Findikyan*, *David McCraw*, *Kurt Wimmer*, *Bruce D. Brown*, and *Gregg P. Leslie* were on the brief for *amici curiae* Coalition of Media Organizations in support of defendant-appellant/cross-appellee.

*Gregory J. Dubinsky*, appointed by the court, argued the cause as *amicus curiae* in support of plaintiff-appellee/cross-appellant. With him on the brief was *Michael J. Gottlieb*.

*Yorie Von Kahl*, pro se, filed briefs for plaintiff-appellee/cross-appellant.

Before: ROGERS, KAVANAUGH, and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH.

KAVANAUGH, *Circuit Judge*: The First Amendment guarantees freedom of speech and freedom of the press. Costly and time-consuming defamation litigation can threaten those essential freedoms. To preserve First Amendment freedoms and give reporters, commentators, bloggers, and tweeters (among others) the breathing room they need to pursue the truth, the Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits. *See generally Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). In this case, we follow that Supreme Court directive.

In 1983, Yorie Von Kahl was convicted in federal court of murdering two U.S. Marshals. Kahl was sentenced to life in prison. In the ensuing years, Kahl has repeatedly turned to the courts, the media, and the public in an effort to publicize his plight and have his conviction overturned and his sentence vacated.

In June 2005, Kahl filed a mandamus petition in the Supreme Court. The petition asked for Kahl's sentence to be vacated. As part of its regular reporting on the Supreme

Court, the Bureau of National Affairs (known as BNA) summarized Kahl's mandamus petition in one of BNA's publications, *Criminal Law Reporter*. The report recounted the "ruling below," including the sentencing judge's statement that Kahl lacked contrition and believed that the murders were justified by his religious and philosophical beliefs. In fact, however, those statements had been made at the sentencing hearing by the prosecutor, not by the judge.

Kahl sued BNA for defamation. Kahl argued that BNA falsely reported that the sentencing judge (rather than the prosecutor) had said that Kahl lacked contrition and believed the murders were justified. BNA moved for summary judgment, asserting among other things that BNA did not act with actual malice in failing to identify the correct speaker at the sentencing hearing. In particular, BNA pointed out that the excerpted transcript of the sentencing hearing that was attached as an appendix to Kahl's mandamus petition did not identify the prosecutor as the speaker and led BNA's reporter to believe that the statements were in fact made by the sentencing judge.

The District Court denied BNA's motion for summary judgment. The District Court concluded that the inaccuracy of BNA's report sufficed for Kahl to overcome summary judgment and obtain a trial on his defamation claim. Recognizing the importance of the First Amendment issue, however, the District Court certified the issue for interlocutory appeal under 28 U.S.C. § 1292(b). On appeal, BNA argues that the inaccuracy of the report alone does not constitute sufficient evidence of actual malice for Kahl to overcome summary judgment. Otherwise, according to BNA, the actual malice standard would be toothless. BNA further argues that the remaining evidence in the record does not suffice for Kahl to overcome summary judgment.

We agree with BNA.  We therefore reverse the order of the District Court denying summary judgment and remand with directions that the District Court grant summary judgment to BNA on these defamation claims.

I

Yorie Von Kahl and his father, Gordon, were vehemently opposed to federal taxation and to federal interference in their lives.  They belonged to anti-government groups that shared those views.

In 1977, Gordon was convicted of failing to file income tax returns.  In 1980, Gordon did not appear in court after he was charged with a probation violation.  Although the court issued an arrest warrant, Gordon repeatedly evaded arrest.

In 1983, U.S. Marshals received word that Kahl family members – including Gordon and Yorie – might be attending a meeting in Medina, North Dakota.  The Marshals went to arrest Gordon.  But the Marshals soon found themselves in a shoot-out with Kahl family members.  During this shoot-out, two U.S. Marshals were shot and killed.

Yorie Von Kahl was subsequently convicted in federal court of two counts of second-degree murder and sentenced to two concurrent life terms.  *See United States v. Faul*, 748 F.2d 1204, 1207-08 (8th Cir. 1984).  Kahl's convictions and sentences were upheld on direct appeal and collateral review. *See id.* at 1223 (direct appeal); *Von Kahl v. United States*, 242 F.3d 783, 793 (8th Cir. 2001) (affirming denial of motion to vacate sentence under 28 U.S.C. § 2255); *Von Kahl v. United States*, 321 F. App'x 724, 732 (10th Cir. 2009) (affirming dismissal of habeas petition under 28 U.S.C. § 2241).

The trial attracted regular press coverage. *See* BNA App. 53-102. In the ensuing years, moreover, Kahl continued to publicize his opposition to federal taxation. He gave an extensive on-camera interview for the documentary *Death and Taxes*. *See id.* at 103-04, 160. During the interview, he said that the shooting "stemmed from our political and religious ideology" and that the Marshals "needed to be shot." *Id.* at 160. He also published a book about his case. *Id.* at 127-28. And he maintained a website defending his cause and advocating for his release from prison. *Id.* at 160.

Kahl has also continued to press his case in the courts. In 2005, he petitioned the Supreme Court for a writ of mandamus that would vacate his sentences. Kahl's mandamus petition included an appendix with an excerpted transcript from his sentencing hearing. *Id.* at 209-11. The excerpted transcript did not expressly identify who was speaking at the hearing. The excerpted transcript opened with a statement that Kahl showed "not even a hint of contrition. The man refused to even talk to the probation officer. We have the statements at trial and those issued to the press and whatnot that this man honestly believes that these murders, cold blooded calculated murders were justified by some sort of a perverted religious philosophical belief." *Id.* at 209-10. Two paragraphs later in the excerpted transcript, the sentencing judge announces Kahl's sentence.

A summary of Kahl's mandamus petition was later published by the Bureau of National Affairs in its *Criminal Law Reporter*. The *Criminal Law Reporter* includes a "Cases Docketed" section where BNA summarizes petitions submitted to the Supreme Court. On August 17, 2005, the Cases Docketed section summarized Kahl's mandamus petition. BNA employee Alisa Johnson prepared the report of

Kahl's petition based on her review of the petition and the attached appendix. Johnson Decl. ¶ 5 (BNA App. 284). The report stated the following, with the key parts bolded for ease of reference:

> *Homicide—Murder of U.S. marshals—Jury instructions—Sentencing.*
> **Ruling below (D. N.D., 6/24/83):**
> **Petitioner, who showed no hint of contrition and made statements to press that he believed that murders of U.S. marshals in course of their duties were justified by religious and philosophical beliefs, is committed to custody of U.S. Attorney General for imprisonment for life** based on his convictions on two counts of violating 18 U.S.C. §§ 1111, 1114, and 2, terms to run concurrently; for 10-year term of imprisonment on each of four counts on which he was convicted of violating 18 U.S.C. §§ 111, 1114 and 2, which terms will run concurrently but consecutively to life term; to five-year term of imprisonment for violating 18 U.S.C. §§ 1071 and 2, term to run consecutively to 10-year term and life term; and to five-year term of imprisonment on his conviction for violating 18 U.S.C. § 371, term to run concurrently to five-year, 10-year, and life terms.
> Questions presented: (1) Must this Court issue writ of mandamus where federal court lacked authority to sentence petitioner upon offenses for which jury returned general verdicts of acquittal and for which jury additionally returned special verdicts for offenses clearly beyond those permitted by constitution and relevant statute; by its plain language—offense that always was and remains exclusive state and nonfederal offense? (2) Must

this Court issue writ of mandamus to enforce petitioner's right to trial by jury where, as here, (1) district court ignored general acquittals for killing U.S. marshals while engaged in performance of their official duties, (2) relied upon verdict for offense punishable only in special maritime and territorial jurisdiction of United States by adding elements from acquitted counts and from outside record to sustain jurisdiction to impose sentence otherwise clearly and patently illegal?

Petition for mandamus filed 6/17/05, by Carl Nadler, and Heller, Ehrman, White & McAuliffe, both of Washington, D.C., and Barry A. Bachrach, and Bowditch & Dewey LLP, both of Worcester, Mass.

BNA App. 274 (emphasis added).

Johnson's supervisor at BNA, Michael Moore, reviewed the report and approved it for publication. Moore Decl. ¶ 4 (BNA App. 266). Both Johnson and Moore stated that they believed the report accurately represented the petition and appendix. Johnson Decl. ¶ 11 (BNA App. 285); Moore Decl. ¶ 5 (BNA App. 266).

In 2007, nearly two years later, Kahl's attorney sent BNA a letter objecting to the report. According to Kahl's attorney, the report falsely stated that Kahl had shown no hint of contrition and that Kahl believed the murders were justified. But the letter did not say that the prosecutor – rather than the sentencing judge – had made those statements at the sentencing hearing. Kahl's attorney requested a retraction, correction, and apology. *See* BNA App. 251-53.

After receiving the letter, Moore reviewed the petition, the appendix, and BNA's report of those documents. Moore Decl. ¶ 7 (BNA App. 266-67). Although he "continued to believe that the summary published in August 2005 accurately represented the contents of Mr. Von Kahl's own petition," Moore nonetheless published a clarification. *Id.* The clarification, published July 18, 2007, read in full:

> In a *Summaries of Recently Filed Cases* entry that ran at 77 CrL 2127, concerning U.S. Supreme Court petition No. 04-1717, **the summary of the sentencing judge's ruling below should have begun: "Petitioner who was said to have believed that murders were justified, . . . ."**

BNA App. 281 (emphasis added). The result of this clarification was in effect to change the relevant portion of the original report from "Ruling below (D. N.D., 6/24/83): Petitioner, who showed no hint of contrition and made statements to press that he believed that murders of U.S. marshals in course of their duties were justified by religious and philosophical beliefs, is committed to custody of U.S. Attorney General for imprisonment for life" to "Ruling below (D. N.D., 6/24/83): Petitioner who was said to have believed that murders were justified, is committed to custody of U.S. Attorney General for imprisonment for life." So the clarification indicated that the sentencing judge in his ruling had referenced some other unspecified person who in turn had said that Kahl believed the murders were justified.

Kahl was still unhappy. Several months later, Kahl himself sent BNA another letter. BNA App. 259-60. In that letter, Kahl for the first time said that the relevant portion of his excerpted transcript quoted statements from the sentencing hearing that had been made by the prosecutor, not by the

sentencing judge. According to Kahl, the published clarification still falsely attributed the statements to the sentencing judge rather than to the prosecutor. Kahl demanded another clarification.

This time, BNA declined. BNA determined that the first clarification – with its general passive-voice statement, "Petitioner who was said to have believed . . ." – adequately addressed Kahl's concerns. *See* Moore Decl. ¶ 10 (BNA App. 267).

Kahl sued BNA in the U.S. District Court. For purposes of the two sets of claims relevant here – the alleged error in the original report and the alleged error in the clarification – the court found that Kahl was a limited-purpose public figure. *See Von Kahl v. Bureau of National Affairs, Inc.*, 934 F. Supp. 2d 204, 217-18 (D.D.C. 2013). As a result, in order to prevail on his claims, Kahl had to demonstrate that BNA acted with actual malice when it falsely attributed the challenged statements to the sentencing judge.

After discovery, BNA moved for summary judgment. The District Court denied the motion. Based on the alleged falsity of BNA's report, the District Court concluded that Kahl produced sufficient evidence of BNA's actual malice. The District Court recognized, however, that there was substantial ground for difference of opinion on that question. The District Court therefore certified the order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). We review the District Court's denial of BNA's summary judgment motion de novo. *Jankovic v. International Crisis Group*, 822 F.3d 576, 584 (D.C. Cir. 2016).

10

II

Kahl has sued BNA under D.C. law for defamation. Defamation is the act of making false statements about someone and damaging his or her reputation. *See Beeton v. District of Columbia*, 779 A.2d 918, 923 (D.C. 2001). Defamation cases often trigger serious First Amendment issues. As the Supreme Court has explained, the First Amendment was intended to ensure "unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964) (internal quotation mark omitted). Defamation cases can hinder that unfettered interchange.

To encourage and facilitate debate over matters of public concern, the Supreme Court has held that the First Amendment protects, among other things, discussion about public officials and public figures. To that end, the Court requires public officials and public figures bringing defamation claims to meet a high burden of proof to prevail. Specifically, public officials and public figures must demonstrate that the publisher of the statement acted with "actual malice." *Id.* at 280; *see also Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 666 (1989). In other words, a public-official or public-figure plaintiff must demonstrate that a publisher either actually knew that a published statement was false, or recklessly disregarded whether it might be false. *New York Times*, 376 U.S. at 280.

Here, we must determine (i) whether Kahl is a public figure for these First Amendment purposes; and (ii) if so, whether he has produced sufficient evidence of actual malice by BNA to overcome summary judgment.

11

A

We first consider whether Kahl is a public figure.[1]

Public figures are those who have "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974). Because of the prominent role that those individuals have sought for themselves on certain issues, their "views and actions with respect to public issues and events are often of as much concern to the citizen" as those of public officials. *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 162 (1967) (Warren, J., concurring in the judgment). Few people "occupy positions" of such "power and influence that they are deemed public figures for all purposes." *Gertz*, 418 U.S. at 345. More commonly, public figures exercise that degree of power and influence on a limited range of topics or issues and are therefore known as "limited-purpose public figures." *See, e.g.*, *Jankovic v. International Crisis Group*, 822 F.3d 576, 584 (D.C. Cir. 2016). The law treats those persons as public figures, but only when it comes to the particular public controversies with which they are associated.

Whether Kahl is a limited-purpose public figure is a "matter of law for the court to decide." *Tavoulareas v. Piro*, 817 F.2d 762, 772 (D.C. Cir. 1987) (en banc). This Court applies a three-part test to determine whether a plaintiff is a

---

[1] The District Court concluded that Kahl is a limited-purpose public figure, but did so in an earlier ruling, not in the order certified for interlocutory review. We still have jurisdiction over the public-figure question, however, because the question of whether Kahl is a limited-purpose public figure is "logically interwoven" with the actual malice question. *United States v. Phillip Morris USA Inc.*, 396 F.3d 1190, 1196 (D.C. Cir. 2005).

public figure. "First, the court must identify the relevant controversy and determine whether it is a public controversy. Second, the plaintiff must have played a significant role in that controversy. Third, the defamatory statement must be germane to the plaintiff's participation in the controversy." *Jankovic*, 822 F.3d at 585 (internal citations omitted).

Under that three-part test, Kahl is a limited-purpose public figure.

*Public Controversy.* An issue is a public controversy if it is "being debated publicly" and has "foreseeable and substantial ramifications for nonparticipants." *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1297 (D.C. Cir. 1980). In determining whether there is a public controversy, a court examines whether "the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment." *Id.*

In this case, there was public controversy concerning the 1983 shootout, as well as about the underlying issues of taxation and federal government power. The press extensively covered the shootout and all stages of Kahl's trial. The press coverage extended beyond the trial itself to include discussion of Kahl's and his father's association with anti-tax and anti-government movements, as well as explorations and discussions of the political and religious ideologies underlying those movements. *See, e.g.*, Joan Hanauer, *Review: In the Line of Duty*, UNITED PRESS INTERNATIONAL, May 10, 1991 (review of TV movie on Kahl's father's political views and the shootout) (BNA App. 53-55); *The Posse Comitatus: What Is It?*, U.S. NEWS & WORLD REPORT, Aug. 8, 1983 (BNA App. 60-61); Wayne King, *Link Seen Among Heavily Armed Rightist Groups*, N.Y. TIMES, June 11, 1983 (BNA App. 91-96). The public discussion of these

issues has continued. *See, e.g.*, *New Evidence in 1983 Kahl Case: Recently Discovered Medical Records Prove Officer Lied; Was Shot by Another Officer—Not Defendant*, IDAHO OBSERVER, Feb. 2006 (BNA App. 107-08); Victor Thorn, *Yorie Kahl's Fight for Freedom*, AMERICANFREEPRESS.NET, Jan. 17, 2010 (BNA App. 109-13). This case involves a public controversy.

*Role in Controversy.* Limited-purpose public figures have "thrust themselves to the forefront" of a public controversy "in order to influence the resolution of the issues involved." *Gertz*, 418 U.S. at 345. To resolve that question, this Court considers "the plaintiff's past conduct, the extent of press coverage, and the public reaction to his conduct or statements." *Lohrenz v. Donnelly*, 350 F.3d 1272, 1279 (D.C. Cir. 2003).

Kahl assumed a public role in the controversy when he used his access to the press to promote his cause. For example, he gave extensive interviews for the 1993 documentary, *Death and Taxes*, where he tied his participation in the shootout (and lack of remorse for his actions) to his "political and religious ideology." BNA App. 160; *see also id.* at 103-04 (Amazon.com page for *Death and Taxes*). In 2004, moreover, Kahl published a book about his case and its relationship to the anti-government and anti-tax movement. *See id.* at 127-28. He also maintained a personal website where he criticized his conviction and promoted his political views. On that website, he described his case as one of "terrorism and murder committed by federal agents." *Id.* at 160. He further described his trial as "an attack upon this nation and our law by the 'cultural communists' who found themselves desperate to extinguish kindled feelings of awareness." *Id.* Various media outlets continue to highlight and plead Kahl's case to the public. *See, e.g.*, *New Evidence*

*in 1983 Kahl Case: Recently Discovered Medical Records Prove Officer Lied; Was Shot by Another Officer—Not Defendant*, IDAHO OBSERVER, Feb. 2006 (BNA App. 107-08); *see also* Victor Thorn, *Yorie Kahl's Fight for Freedom*, AMERICANFREEPRESS.NET, Jan. 17, 2010 (BNA App. 109-13).

In short, Kahl has thrust himself to the forefront of the controversy and has worked to maintain his place in the spotlight.

*Germaneness.* "The purpose of the germaneness inquiry is to ensure that the allegedly defamatory statement—whether true or not—is related to the plaintiff's role in the relevant public controversy. This ensures that publishers cannot use an individual's prominence in one area of public life to justify publishing negligent falsehoods about an unrelated aspect of the plaintiff's life." *Jankovic*, 822 F.3d at 589. BNA's report relates to Kahl's role in the controversy. The report covers Kahl's conviction for his role in the shootout and his petition to have his sentence vacated. It highlights Kahl's ideology. And it cites Kahl's engagement with the press.

In sum, Kahl's active role in the controversy concerning the shootout and in the debate over taxes and the federal government means that he is a limited-purpose public figure in this case.

B

We next consider whether Kahl produced sufficient evidence of BNA's actual malice to overcome summary judgment.

As relevant here, Kahl asserts two categories of defamation claims: one related to BNA's original report and one related to BNA's clarification. As a limited-purpose public figure, Kahl must establish that BNA published the allegedly defamatory statements with actual malice. *New York Times*, 376 U.S. at 279-80. A statement is made with actual malice if the statement is made with "knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 280. Actual malice may be inferred through circumstantial evidence, including "the defendant's own actions or statements, the dubious nature of his sources, [or] the inherent improbability of the story." *Liberty Lobby, Inc. v. Dow Jones & Co., Inc.*, 838 F.2d 1287, 1293 (D.C. Cir. 1988). Whatever proof is offered, that proof must show that "the defendant *in fact* entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (emphasis added).

The Supreme Court and this Court have emphasized that a public-figure plaintiff faces a "daunting" summary judgment standard. *Jankovic*, 822 F.3d at 590; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986). The standard is "significantly more onerous than the usual preponderance of the evidence standard." *Tavoulareas*, 817 F.2d at 776. To survive a motion for summary judgment, a plaintiff who is a public figure must present "clear and convincing evidence" of actual malice. *Anderson*, 477 U.S. at 256. That heightened summary judgment standard helps "prevent persons from being discouraged in the full and free exercise of their First Amendment rights." *Washington Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966). Summary proceedings "are essential in the First Amendment area because if a suit entails 'long and expensive litigation,' then the protective purpose of the First Amendment is thwarted even if the defendant ultimately prevails." *Farah v. Esquire*

*Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013) (quoting *Keogh*, 365 F.2d at 968).

Kahl argues that BNA's report and clarification are false because they attribute certain sentencing statements to the sentencing judge, rather than to the prosecutor. But falsity alone does not equate to actual malice. And Kahl has offered insufficient evidence, direct or circumstantial, that any BNA employees had actual malice – that is, that any BNA employee actually knew that the prosecutor made those statements or recklessly disregarded whether the statements were made by the prosecutor rather than by the judge.

To begin with, the BNA author and her supervisor both stated that they believed that the initial BNA report was true when it identified the sentencing judge as the author of those statements. And the supervisor who prepared the clarification stated that he believed that the clarification was true. Of course, actual malice "rarely is admitted." *Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921, 927 (2d Cir. 1987). Kahl therefore advances two arguments to support an inference of actual malice.

*First*, Kahl says that he presented sufficient evidence that BNA's initial report was made with actual malice. We disagree.

The BNA report includes a summary of the sentencing judge's "ruling." The BNA report indicates that the sentencing judge stated that Kahl lacked contrition and believed the murders were justified. Of course, we now know that it was the prosecutor, not the judge, who actually made those statements at sentencing about Kahl's lack of contrition and belief that the murders were justified. But BNA's mistake – suggesting that statements were made by the judge

rather than the prosecutor – occurred because BNA relied on the excerpted transcript that was attached as an appendix to Kahl's mandamus petition.  The excerpted transcript contains excerpts from the sentencing hearing.  The only name on the excerpted transcript is that of the sentencing judge.  The only speaker identified in the transcript is the judge.  And the transcript included the excerpts of the judge announcing the sentence.  The excerpted transcript does not contain any reference to the prosecutor speaking.  So a reasonable reader of the excerpted transcript would have thought it was the sentencing judge speaking throughout.  It was therefore not unreasonable, much less evidence of actual malice, for BNA to read the transcript that way and report it in that fashion.

Kahl says, however, that actual malice can be inferred because one sentence on page 5 of his 28-page mandamus petition suggested that some statements in the excerpted transcript were made by the prosecutor.  According to Kahl, that one sentence should have alerted BNA that the prosecutor was also the speaker with regard to the statements at issue in this case.  But the one sentence in the mandamus petition does not indicate that the statements at issue in this case were made by the prosecutor, rather than the sentencing judge.  On the contrary, a reasonable reader who read the petition and the appendix still would have thought it was the judge who made the statements at issue in this case.  And it certainly was not actual malice for BNA to read the transcript that way.  At most, Kahl has demonstrated that BNA, upon a more careful reading of the appendix in conjunction with the petition, could have connected some dots and suspected that the prosecutor made the statements at issue in this case.  But an "honest misinterpretation does not amount to actual malice even if the publisher was negligent in failing to read the document carefully." *Jankovic*, 822 F.3d at 594; *see also Time, Inc. v. Pape*, 401 U.S. 279, 290, 292 (1971); *New York Times*, 376

U.S. at 286, 288. In short, Kahl has provided insufficient evidence that BNA acted with actual malice in publishing its initial report.

*Second*, in the wake of Kahl's letter complaining about the initial report, BNA published a clarification. The clarification still summarized the "ruling below" and still recounted the sentencing judge saying that Kahl believed the murders were justified. Kahl argues that the clarification should have attributed to the prosecutor the statements that Kahl believed the murders were justified. But Kahl's letter to BNA did not say that it was the prosecutor speaking. Kahl's letter merely said that it was not Kahl speaking. After receiving the letter, BNA again reviewed the excerpted transcript and again reasonably concluded that the excerpted transcript quoted the sentencing judge. Under those circumstances, it was not actual malice for BNA to continue to attribute the statements to the sentencing judge. *See Lohrenz*, 350 F.3d at 1284 (publishers are expected to "act reasonably in dispelling" doubts about the accuracy of their publication that might arise during the publishing process). In short, Kahl has provided insufficient evidence that BNA acted with actual malice in publishing the clarification.

Let's take a step back. The source of the problem in this case was Kahl's poorly put-together excerpted transcript that was attached to his mandamus petition. The excerpted transcript included comments of the prosecutor and sentencing judge at the sentencing hearing, but it appeared to be only the sentencing judge who was speaking throughout the excerpted transcript. Based on the excerpted transcript, it was therefore entirely reasonable for BNA to think it was the sentencing judge who was speaking throughout. And it certainly was far from actual malice for BNA to report that the sentencing judge made the statements in question.

Moreover, the initial letter from Kahl's attorney did not correct the misimpression created by the excerpted transcript. So it was far from actual malice for BNA's clarification to continue to say that the sentencing judge made the statements in question. Also, given that BNA reasonably relied on the excerpted transcript prepared by Kahl, it was not reckless for BNA to fail to obtain the full transcript of the 1983 sentencing hearing (assuming it was actually available).

It is true that after BNA published the clarification, Kahl sent yet another letter to BNA that finally said that it was the *prosecutor* who made the statements at the sentencing hearing. At that point, BNA did not publish a retraction. But we know of no authority that would *require* a retraction. *See McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1515 (D.C. Cir. 1996). It is often said that a failure to retract "may support actual malice, but it does not necessarily prove actual malice, because it does not prove a wrongful state of knowledge *at the time of initial publication*." 1 SACK ON DEFAMATION § 5:5.2, at 5–113 (4th ed. 2016) (internal quotation marks omitted). The actual malice inquiry focuses on the defendant's state of mind at the time of publication. Here, therefore, the question is whether BNA acted with actual malice when the initial report and clarification attributed the statements to the sentencing judge. Given the way the excerpted transcript appeared in the appendix to the mandamus petition, given that Kahl's first letter did not reference the prosecutor, given that BNA acted reasonably in reviewing its report and the excerpted transcript after receiving Kahl's first letter, and given that BNA acted reasonably in publishing the clarification, the answer is no.

20

\* \* \*

We reverse the order of the District Court denying summary judgment and remand with directions that the District Court grant summary judgment to BNA on these defamation claims.[2]

*So ordered.*

---

[2] In an earlier order in this case, the District Court also dismissed a separate libel per se claim asserted by Kahl. But as BNA notes, that District Court order was not certified for interlocutory review and is not logically interwoven with the issue that was certified for interlocutory review. We therefore lack jurisdiction to consider the libel per se issue. *See* 28 U.S.C. § 1292(b).